EAST BATON ROUGE PARISH
Filed Oct 05, 2021 8:26 AM
Deputy Clerk of Court
E-File Received Oct 04, 2021 4:30 PM

C-711985
24

| | |
|---|---|
| **PLAINTIFFS:**<br>**JANE DOE #1 (Undergrad)**<br>**JANE DOE #2 (Undergrad)**<br>**JANE DOE #3 (Undergrad)**<br>**JANE DOE #4 (Graduate Asst.)**<br>**JANE DOE #5 (Graduate Asst.)**<br>**JANE DOE #6 (Professor)** | **NUMBER _____ SEC. _____**<br><br>**19TH JUDICIAL DISTRICT COURT**<br><br>**PARISH OF EAST BATON ROUGE**<br><br>**STATE OF LOUISIANA** |
| **VERSUS** | |
| **DEFENDANTS:**<br>**BOARD OF SUPERVISORS OF**<br>**LOUISIANA STATE UNIVERSITY AND**<br>**AGRICULTURAL AND MECHANICAL**<br>**COLLEGE** | |
| **DR. ADELAIDE RUSSO; Department**<br>**Chair, LSU Department of French Studies,**<br>**individually and in her official capacity** | |
| **DR. TROY BLANCHARD, Dean, LSU**<br>**College of Humanities and Social Sciences**<br>**JENNIE STEWART, LSU Title IX**<br>**Coordinator, individually and in his official**<br>**capacity;** | **JURY TRIAL REQUESTED** |
| **JENNIFER NORMAND, LSU Executive**<br>**Director of Employee Relations, Human**<br>**Resources Management, individually and**<br>**in her official capacity** | |
| **LINDSAY MADATIC, LSU Deputy Title**<br>**IX Coordinator for Employees for HRM,**<br>**individually and in her official capacity.** | |

## PETITION FOR DAMAGES

Plaintiffs Jane Does #1 - #6 jointly bring this action against all Defendants under

Louisiana Civil Code article 2315 (negligence / intentional infliction of mental distress), art.

2317, 2320 (*respondeat superior*) for violations of their rights under Title IX of the Education

Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681, *et seq.*, and pursuant to 42 U.S.C. § 1983

for deprivation of their constitutionally protected rights to equal protection of the laws under the

Fourteenth Amendment and freedom of speech guaranteed by the First Amendment to the U.S.

Constitution and for breach of contract.

1

EXHIBIT A-1

**PARTIES**

1.      Plaintiffs Does #1 - 5 are persons of the age of majority and current or former students of

LSU. They were citizens of Louisiana at the time of the events alleged in this complaint. Doe

#4 is currently a permanent resident of Canada.

2.      Plaintiff Doe #6 is an Associate Professor in the Department of French Studies at LSU

and is a citizen of Louisiana.

3.      Defendant Board of Supervisors of Louisiana State University and Agricultural and

Mechanical College (the "Board" or "LSU") is the governing body of the Louisiana State

University system, and is a public constitutional corporation organized and existing under the

laws of the State of Louisiana to operate, manage, and control the system, including its campus

in Baton Rouge, with its principal place of business located at 3810 West Lakeshore Drive,

Baton Rouge, Louisiana 70808.

4.      LSU is a recipient of federal funds within the meaning of 20 U.S.C. § 1681(a) and is

therefore subject to Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688.

5.      Defendant Dr. Adelaide Russo ("Russo"), in her official and personal capacity, was at all

relevant times a person of the age of majority and an agent and/or employee of LSU. Since

August of 2017, Russo has served as the Chair of LSU's Department of French Studies. Upon

information and belief, Russo is a citizen of Louisiana.

6.      Defendant Troy Blanchard ("Blanchard"), in his official and personal capacity, was at all

relevant times a person of the age of majority and an agent and/or employee of LSU. He served

as Interim Dean of the College of Humanities and Social Sciences at LSU from May 2018 to

November 2019, and thereafter as Dean of the College.  Upon information and belief, Blanchard

is a citizen of Louisiana.

7.      Defendant Jennifer Normand ("Normand"), in her official and personal capacity, was at

all relevant times a person of the age of majority and an agent and/or employee of LSU. She has

served as Executive Director of Employee Relations at LSU since May of 2002. Upon

information and belief, Blanchard is a citizen of Louisiana.

8.      Defendant Jennie Stewart ("Stewart"), in her official and personal capacity, was at all

relevant times a person of the age of majority and an agent and/or employee of LSU. From 2015

to March 2021, Stewart served as LSU's Title IX Coordinator. Upon information and belief,

Stewart is a citizen of Louisiana.

9.      Defendant Lindsay Madatic ("Madatic"), in her official and personal capacity, was at all relevant times a person of the age of majority and an agent and/or employee of LSU. Madatic has served as Associate Director of Employee Relations in the Office of Human Resources Management (HRM) since June of 2010. During all relevant times, she also served as Deputy Title IX Coordinator for Employees with HRM. Upon information and belief, Madatic is a citizen of Louisiana.

## JURISDICTION & VENUE

Louisiana Constitution, Article XII, § 10 (A) waives the State's sovereign immunity in suits based in contract and tort.  These actions are brought pursuant to the Louisiana Governmental Claims Act, La. R.S. 13:5101, *et seq,* with specific reference to La. R.S. 13:5106 which provides that suits against political subdivisions shall be instituted in Louisiana state court.

Venue is proper in East Baton Rouge Parish because Louisiana State University and its Board of Supervisors, as well as, are domiciled in East Baton Rouge and it is the parish in which these causes of action arose.

Venue is proper as to all other named Defendants pursuant to La CCP articles 42, and 74 as they are all residents of Louisiana, domiciled in East Baton Rouge, their conduct and the causes of action asserted against them and damages sustained by Jane Does #1-6 occurred in East Baton Rouge Parish.  Plaintiffs further assert that venue is proper in East Baton Rouge Parish pursuant to La CCP article 73 as all Defendants named herein are solidary obligors.

## CONFIDENTIALITY

10.     Plaintiffs desire to proceed under pseudonyms. Does #1-3 were victims of rape and/or sexual assault, are current students at LSU who wish to avail themselves of their right to confidentiality pursuant to Article I, §25 of the Louisiana Constitution and the Louisiana Crime Victims' Rights Laws, including but not limited to La. R.S. 46:1841 and §1844 (W)(1)(a). All plaintiffs have made reports of sexual harassment, hostile environment, endangerment of students and/or retaliation.

11.     On information and belief, there are additional victims who were sexually harassed, assaulted and/or raped by d'Espalungue who made or attempted to make complaints to LSU and/or the individual defendants, and who will be deterred from reporting similar incidents unless their identities are likewise protected.

12.     Plaintiffs respectfully request that in light of the sensitive and highly personal nature of their claims and the risk that public disclosure of their names would cause further psychological trauma, plaintiffs should be allowed to proceed under pseudonyms.

13.     Defendants are already aware of Plaintiffs' true identities. Accordingly, there will be no prejudice to defendants, who are fully capable of investigating and responding to plaintiffs' allegations. Allowing these victims to proceed under pseudonyms would best serve the ends of justice.

## INTRODUCTION

14.     Edouard d'Espalungue d'Arros is a charming, handsome, and successful serial sexual predator from France who was a graduate student and employee at LSU's Department of French Studies from August 2017 until November 20, 2020, when LSU suspended him for one year for the September 6, 2020, rape[1] of LSU undergraduate student Doe #1. At the time, d'Espalungue was just shy of his 30th birthday and the victim was age 20.

15.     Two years prior to this, also while an LSU employee and grad student, d'Espalungue was arrested for sexual battery and second-degree (forcible) rape of a 21-year-old ULL[2] student on September 30, 2018, at a Catholic student retreat being held in Rapides Parish.

16.     D'Espalungue posted $100,000 for two commercial bail bonds, surrendered his passport to the Rapides Parish Sheriff's Department, and returned to LSU.

17.     In the period between his 2018 rape arrest and his rape of Doe #1 on September 6, 2020, and continuing through the spring of 2021, d'Espalungue subjected Does #1-5 and many other female LSU students, both within and without the Department of French Studies, to unwelcome sexual harassment, including *quid pro quo* harassment,[3] sexual assault, and/or rape that constituted discrimination on the basis of sex.

---

[1] A Student Advocacy and Accountability hearing panel found that the complainant, who had only recently met d'Espalungue, asked to be taken back to her apartment but D'Espalungue took her to his apartment instead where they had sex which was non-consensual (i.e. rape). Doe #1 did a rape kit and reported the assault to the Title IX office on September 8, 2020. D'Espalungue was found guilty of sexual misconduct and endangerment. LSU defines "Sexual Misconduct" in PM-73 (see Exhibit A) as "(e.g. sexual assault, stalking, dating violence, domestic violence, sexual exploitation, retaliation, etc.)" PM-73 defines "sexual assault" as "sexual contact or penetration without consent" with three subcategories: 1) Forcible Sex Offenses include "Forcible Rape, Forcible Sodomy, Sexual Assault with an Object, Forcible Fondling;" 2) "Sex Offenses, Non-forcible includes sexual intercourse as a result of incest or statutory rape; and 3) "Sexual Assault also includes sexual battery as defined in La. R. S. 14:43.1."

[2] University of Louisiana at Lafayette.

[3] Under Title IX regulations, *quid pro quo* sexual harassment is defined as follows: "An employee of the recipient conditioning the provision of an aid, benefit, or service of the recipient on an individual's participation in unwelcome sexual conduct." 34 C.F.R. 106.30 (a). As discussed *infra*, d'Espalungue was an employee of LSU acting in a leadership role within the French Department when he conditioned Doe #3's continued involvement with LSU activities upon her participation in unwelcome sexual conduct.

4

18.    LSU officials with authority to rectify the situation had actual knowledge that d'Espalungue posed a substantial risk of sexual harassment and severe harm to students based on his arrest for sexual battery. D'Espalungue's re-arrest four days later after a more thorough investigation by Rapides Parish detectives, and a new charge of second-degree (forcible) rape, was incontrovertible evidence that d'Espalungue posed a substantial risk of sexual harassment and severe harm to LSU students.

19.    LSU's sole response to the battery and rape arrests was to remove d'Espalungue from the French 1001 class which he had begun teaching at the beginning of the fall semester. His class included several freshmen students, including Doe #2 and Doe #3.

20.    LSU did not bar d'Espalungue from employment at LSU or take any actions to prevent him from having access to LSU students in a leadership position.

21.    Dr. Adelaide Russo, Chair of the Department of French Studies, immediately hired d'Espalungue as her personal research assistant, essentially promoting him to a status of greater influence and prestige within the department. He continued leading French Department activities such as French Table and French Movie Night which brought him in touch with undergrads, including his former students Doe #2 and Doe #3.

22.    D'Espalungue was also in charge of the French Department web page and the LSU French Club, including its social media platforms, where he energetically engaged with LSU undergrads and other students.

23.    Soon after d'Espalungue's arrest, Dr. Russo met individually with grad students and faculty in the French Department, including Does #4-6, told them that d'Espalungue was "innocent," that he should be supported and his privacy respected, and that any further discussion of his rape arrest would violate FERPA.[4]

24.    Grad students Does #4 and #5 reported to Dr. Russo that they had been sexually harassed by d'Espalungue and had seen him sexually harass other students. Dr. Russo dismissed these claims and made clear she was irritated by the reports. She told Doe #4 she should consider d'Espalungue's verbal harassment "a compliment," an early example of what become a continuing series of comments and behaviors by Russo reinforcing gender stereotypes and dismissing women.

---

[4] FERPA is The Family Educational Rights and Privacy Act which protects the privacy of student records. It does not apply to public news reports of criminal arrests.

25.    Both grad students reported their complaints to other LSU officials with authority to rectify the situation on multiple occasions, but no investigation was launched, and no interim measures were implemented.

26.    Doe #6, a professor in the French Department, filed multiple and urgent complaints with various LSU officials - all of whom had authority to rectify the situation - beginning in 2018 and continuing until 2021 regarding d'Espalungue's conduct, his access to undergrads which endangered them, and the fact that Russo was hostile to grad students who had reported harassment by d'Espalungue and/or concern for undergrads with whom he was interacting as a "leader" of French Department activities. As a result of her reporting, Doe #6 was subjected to a hostile work environment and a continuing series of retaliatory actions.

27.    On November 7, 2018, Associate Dean Jason Hicks of the College of Humanities and Social Sciences met with d'Espalungue and Russo, told them there had been complaints, and "made clear" why d'Espalungue had been removed from the classroom. Dean Hicks specifically asked if d'Espalungue was "leading anything" and Russo and d'Espalungue both denied it. They reported that he was "taking classes, helping Dr. Russo w/activities – research, projects."[5]

28.    These statements were false, and LSU officials with authority to rectify the situation were given actual notice that the statements were false. In fact, later on the same day, Professor Doe #6 sent a text message to Dean Troy Blanchard stating, "*As long as Edouard is allowed to be a senator, VP of the grad student association, and coordinator of (and attendee at!!) French table and cinema club, the students are not being protected. If the point of removing his teaching assistantship was to protect undergraduates, then he should also be prevented from attending any undergrad events or interacting with that student population.*"

29.    No action was taken in response to this information.

30.    In ensuing weeks, more complaints were lodged with LSU officials with authority to rectify the situation regarding d'Espalungue's activities.

31.    LSU was deliberately indifferent to this information, launched no investigation, and implemented no interim measures to protect students.

---

[5] *See* 00235918_LM Notes with J Hicks, in Title IX file of Doe #4 (Handwritten notes of Lindsay Madatic, Deputy Title IX Coordinator for Employees, HRM, dated January 17, 2018 which documented a meeting on November 7, 2018 between Associate Dean Jason Hicks, Dr. Russo and d'Espalungue.

32.    Associate Dean Hicks met again with Russo on January 24, 2019, being well aware of complaints that she was protecting d'Espalungue and retaliating against students who reported him.

33.    Russo again denied that d'Espalungue was doing any service which would put him in contact with other students. Again, this was a lie, easily refuted by numerous witnesses who had reported the opposite.

34.    Over the course of two and a half years, more complaints were filed with LSU officials with authority to rectify the situation, including the Dean's Office, the Title IX office and Human Resources Management concerning d'Espalungue's ongoing endangerment of female undergrads, harassment of grad students, and the hostile educational and work environment within the Department of French Studies.

35.    While a few Title IX case records were opened, students were not informed of the outcomes or whether investigations had even been conducted. There is no record that any investigation was launched, or interim measures implemented. On at least one occasion, the Title IX office specifically found that the complaints of harassment did not rise to the level requiring an investigation, despite the fact that d'Espalungue was still facing criminal charges of forcible rape and had multiple complaints lodged against him involving sexual harassment and interactions with undergrads in the role of a teacher and leader of French Department activities, which he was prohibited from doing by the Dean of his College.

36.    D'Espalungue's behavior ranged from comments about students' bodies, marital status, weight, sexual history, and physical appearance, to sexualized and improper text messages, to following students to their cars on multiple occasions, to blocking them from LSU French Club social media accounts in retaliation for reporting harassment or declining his advances, to unwelcomed touching, hugs, fondling, sexual assault, sexual battery and rape.

37.    Due to the deliberate indifference of LSU officials, and an official policy of gender discrimination, d'Espalungue – an LSU employee -- eventually raped Doe #2 on January 31, 2019, raped Doe #1 on September 6, 2020, and sexually assaulted Doe #3 on multiple occasions in 2019. Does #1-3 are all approximately 10 years younger than d'Espalungue.

38.    Does #4 and #5, who were grad students in the Department of French Studies, and Doe #6, a professor, endured a continuing series of hostile and retaliatory actions and conduct

from Dr. Russo beginning in October 2018 and continuing through the spring of 2021 in retaliation for their reporting d'Espalungue's harassment.

39.     The continuing and cumulative series of hostile actions by Russo, combined with the deliberate indifference with which their Title IX reports of sexual harassment and retaliation were treated, created a hostile educational and work environment for Does #4 and #5, which made continuing their educations at LSU as planned unbearable. Doe #4 gave up her full-time status as a Ph.D. student at the end of the fall semester 2019. She lost her financial aid and employment, lost physical access to the LSU library, and is attempting to finish her Ph.D. as a part-time student living as a permanent resident outside the United States.

40.     As a direct consequence of the hostile environment in the French Department, Doe #5 gave up the pursuit of her Ph.D. altogether after the spring semester 2021, even though she had completed her Masters' degree and all coursework for her Ph.D. She could no longer endure the mental, emotional and psychological pain caused by the hostile environment in the French Department.

41.     One of the most egregious aspects of this case, and the source of great mental distress to all plaintiffs, is watching's deliberate indifference while Louisiana high school students are potentially being endangered by this serial sexual predator, despite multiple complaints to LSU officials with authority to rectify the situation.

42.     As will be described in more detail below, with the help of Dr. Russo and the LSU Department of French Studies, D'Espalungue launched in the spring of 2019 what was billed as an "LSU academic journal"[6] called the American Journal of French Studies ("AJFS" or "the Journal"). The launch was supported by CODOFIL and word quickly spread via social media and emails to other Louisiana French language and cultural organizations. As "executive director," d'Espalungue was permitted by LSU to travel to Louisiana high schools promoting the Journal as part of the LSU Department of French Studies and inviting high school students to submit essays for an annual contest with cash prizes.

43.     D'Espalungue presided over the Journal's first awards ceremony at the French House on the LSU campus on April 25, 2019, immediately following awards ceremonies for the

---

[6] See Facebook post at Alliance Francaise of New Orleans dated September 3, 2019, disseminating a "flyer" created by AJFS which stated, "Meet and Greet with American Journal of French Studies, September 16, 6pm, 1519 Jackson Ave. Presenting LSU's French academic journal which promotes the French language and culture in the United States." https://facebook.com/afneworleans/photos/gm.2307876235993884/2792843597413128

Department of French Studies, presided over by Dr. Russo. During the ceremony, d'Espalungue

expressed to at least one witness his sexual and romantic interest in one of the high school essay

contestants. Within a few weeks d'Espalungue had seduced her into a sexual relationship which

lasted on and off for at least several months.

44.    In November 2020, five LSU undergrads filed Title IX complaints about harassment by

d'Espalungue and endangerment of other female LSU students and high school students. Three

students submitted written statements.

45.    Doe #3's written statement described d'Espalungue's extreme charm and relentless

sexual pursuit of her and other much younger women, including unwelcome touching, grabbing,

and attempts at kissing despite her consistent refusals to engage in a sexual relationship with

him; how he used his 10-year age difference and his positions as leader of AJFS and French Club

to "groom" her and other young women; how he used an alias to shield his identity.

46.    Doe #3 attached more than 50 pages of screenshots of d'Espalungue's raunchy and

inappropriate texts. Among them were, "You have beautiful boobs;" "U just uncomfortable

talking bout sexy stuff;" "u need to chill and grow up;" "I think u have a problem with anything

that relates to sex and guys seriously;" "If we kiss it's easier to shut up." He repeatedly asked her

to meet him alone. He claimed to be collecting nudes from all over Louisiana, texting, "I want to

get my first country nudes," "I still have no nudes from [her Parish]," "Trying to do the entire

map of Louisiana." "You know like boardgame." "A flag on every district."


47.    Doe #3 expressed fear for young female LSU and high school students:

> He is still, however, the leader of AJFS and the leader of the LSU French Club, which
> has very young girls in it, and one of which where he has made a freshman his "vice
> president." Like with us, he offers opportunities to those that do not have the
> qualifications and makes it so they owe him. I am obviously worried that the same
> things will happen or is happening to them and that he will groom them like he did us. I
> do not think he is fit to be in these positions and I think LSU should look at our
> accounts and his past history and reevaluate him.

48.    Doe #2, Doe #3 and a third LSU undergrad participated in a Zoom conference with Title

IX Coordinator Jennie Stewart on November 16, 2020. Her response with respect to

d'Espalungue using AJFS/LSU French Club to meet and groom high school students was, "well,

that's not LSU policy," and "he didn't do anything illegal." These statements were shocking and

distressing, causing additional emotional and mental pain, anger, and frustration to these young

students. They were also a potent example of LSU's culture of indifference to female victims of sexual discrimination, even when it involves power-based harassment.

49.     D'Espalungue left the country on December 14, 2020, and is now a fugitive in connection with the rape charges in Rapides Parish. The court there, with no objection from the District Attorney, granted a motion allowing d'Espalungue to travel to his parents' home in Paris for the Christmas holidays. D'Espalungue has never returned. He was indicted for third-degree rape by a Rapides Parish Grand Jury on February 23, 2021. His bonds were revoked on March 25, 2021 when he failed to appear in court.

50.     Plaintiffs did not know and could not have known until the Husch Blackwell Report [7] was released on March 3, 2021 that LSU had an official policy and practice of deliberate indifference to gender discrimination which ignored plaintiffs' rights to an educational and work environment free of sexual harassment and misconduct, and that there was a direct causal connection between this official policy and the sexual harassment, assaults, and/or rapes they experienced.

51.     Plaintiffs did not know and could not have known of the facts surrounding LSU's official policy and custom of gender discrimination because LSU fraudulently concealed these facts from plaintiffs and other female LSU students and faculty until release of the Husch Blackwell Report on March 3, 2021.

52.     The Report describes long-standing policies at LSU of underfunding and under-staffing the Title IX Office, ignoring guidance from the Department of Education, ignoring recommendations of its own Task Force in 2017, and allowing an organizational culture in which complaints of sexual assault and/or harassment were rarely investigated or taken seriously. "Institutional policies were unclear, edicts were issued by supervisors that conflicted with policy, employees were overburdened with vast institutional roles and not provided with appropriate resources, calls for additional resources went unheeded, concerns were not responded to, etc."[8]

---

[7]  LSU retained the Husch Blackwell law firm to conduct the independent review in response to a November 2020 USA Today article by Kenny Jacoby titled *LSU mishandled sexual misconduct complaints against students, including top athletes*, USA TODAY, November 16, 2020, https://www.usatoday.com/in-depth/sports/ncaaf/2020/11/16/lsu-ignored-campus-sexual-assault-allegations-against-derrius-guice-drake-davis-other-students/6056388002/. A copy of the Report is attached as Exhibit B. A copy is also available online at https://www.lsu.edu/titleix-review/ (accessed September 26, 2021).

[8] *Husch Blackwell Report, "Recommendations,"* p. 137. (Exhibit B).

53.    LSU officials with authority to rectify the situation had actual knowledge of multiple instances of sexual harassment, sexual assault, power-based gender discrimination and endangerment, yet failed to conduct a prompt investigation or take appropriate interim measures pending investigation of the complaints in violation of Title IX.

54.    LSU had a custom, policy, and practice of failing to properly record, investigate, and process reports of sexual harassment or assault against women.

55.    LSU's policies and practices created a heightened risk of assault for plaintiffs and other female students at LSU by d'Espalungue. As a direct result, d'Espalungue raped Does #1 and #2, sexually assaulted Doe #3 on multiple occasions, and sexually harassed Does #4 and #5.

56.    LSU's official policies and deliberate indifference caused plaintiffs to undergo harassment and/or made them liable or vulnerable to it. *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 645 (1999).

57.    The harassment and assaults were severe, pervasive and objectively offensive and created a hostile educational environment which deprived Does #1-5 of access to the educational opportunities and benefits provided by the school, and subjected Does #4-6 to retaliation for reporting harassment and endangerment of undergrads.

58.    Plaintiffs seeks monetary damages for physical, mental, emotional and career harm as well as for pecuniary losses.

## FACTS

59.    French foreign national Edouard d'Espalungue enrolled on August 21, 2017 as a graduate student in LSU's Department of French Studies. He earned his M.A. in French Studies in May of 2020, and thereafter commenced a Ph.D. program in the same department.

60.    Doe #4 and Doe #5 also began their graduate programs in the same department in August of 2017, Doe #4 studying for her Ph.D. in French Literature and Doe #5 studying for her M.A. in French Studies, with a plan to eventually pursue a Ph.D. at LSU.

61.    At all relevant times, Doe #4, Doe #5, and d'Espalungue were all employed by LSU as graduate or teaching assistants or in other capacities.

62.    On September 30, 2018, d'Espalungue was arrested for sexual battery of a 21-year-old ULL[9] student at a Catholic student retreat being held in Rapides Parish. He was released on a $25,000 bond and returned to LSU.

---

[9] University of Louisiana at Lafayette, one of nine public universities in the University of Louisiana System.

63.    On October 1, 2018, ULL Police notified LSU officials of d'Espalungue's arrest.

64.    Because d'Espalungue was an LSU employee (a graduate assistant), Lindsay Madatic in Human Resources Management (HRM) took the lead in alerting other officials at LSU. This was consistent with LSU policy that HRM investigates Title IX complaints against employees.[10]

65.    Madatic emailed Troy Blanchard, Interim Dean of the College of Humanities and Social Studies (HSS), as well as Jason Hicks, Associate Dean, and attached a copy of the LSU Police report. Madatic states, "it is safe to say that he won't be reporting to work for the time being." Dean Hicks replies, stating he looked up d'Espalungue on the inmate locator.[11]

66.    Rapides Parish detectives conducted further investigation over the following days, and re-arrested d'Espalungue on October 4, 2018, on a charge of second-degree or "forcible" rape.[12] D'Espalungue was re-booked into the Rapides Parish jail, posted an additional $75,000 bond, relinquished his passport, and returned to LSU.

67.    LSU learned of the forcible rape arrest no later than October 10, 2018, when news stories along with d'Espalungue's mug shot appeared in the media, including WBRZ-TV in Baton Rouge, KATC-TV in Lafayette, LSU's publication The Reveille and LSU's TigerTV.[13]

68.    Prior to his 2018 rape arrest, d'Espalungue had been teaching a French 1001 class which included freshmen Doe #2 and Doe #3.

69.    Upon learning of the rape arrest, Troy Blanchard, Interim Dean of the Department of French Studies, removed d'Espalungue from his job as a graduate teaching assistant to limit his contact with other students.

---

[10] *See Husch Blackwell Report*, p. 11: "Investigations of complaints against employees continued to be handled by the University's "Employee Relations" department of Human Resource Management.

[11] At LSU, investigations of complaints against employees are handled either by the Title IX Office or by the University's Employee Relations department of Human Resource Management.

[12] *See* La. R.S. 14:42.1(C). "For all purposes "forcible rape" and "second degree rape" mean the offense defined by the provisions of this Section, and any reference to the crime of forcible rape is the same as a reference to the crime of second degree rape..."

[13] *See* "LSU grad student arrested for alleged rape in Rapides Parish" published by WBRZ, https://www.wbrz.com/news/lsu-grad-student-arrested-for-alleged-rape-in-rapides-parish/, published October 10, 2018, accessed August 11, 2021. *See also* "LSU SGA senator arrested on rape charge in Rapides" published by KATC News on October 10, 2018, accessed August 11, 2021 at https://www.katc.com/news/covering-louisiana/2018/10/10/lsu-sga-senator-arrested-on-rape-charge-in-rapides/. LSU Reveille published a story on October 10, 2018: https://www.lsureveille.com/edouard-despalungue/image_247b3030-ccdf-11e8-a66c-f77458e587fe.html. The Reveille story was linked to the Tiger TV story published on the same date: https://www.tigertv.tv/news/lsu-grad-student-arrested-for-alleged-rape/article_d5d4eb27-937c-590d-a804-4898e9bb609b.html

70.     Dr. Russo, however, negated this limited response and took affirmative steps to elevate

d'Espalungue within the Department and assure his continued contact with other students,

including undergrads. Dr. Russo asked d'Espalungue to continue grading and/or critiquing

papers of his former French 1001 class, which included undergrad students Doe #2 and Doe #3.

71.     Dr. Russo hired d'Espalungue as her personal Research Assistant, thus at all relevant

times, d'Espalungue remained an employee of LSU.[14] Dr. Russo tasked d'Espalungue with

observing and videotaping classes that other Graduate Assistants (GAs) were teaching in the fall

of 2018, handing out French Department awards to the undergrads on April 22, 2019, and posing

in photographs with them. Dr Russo gave d'Espalungue the keys to her home and he ran errands

for her as a personal assistant.

72.     In addition, with full knowledge and support of Dr. Russo, d'Espalungue continued

activities which brought him into regular contact with students, including his former students,

Doe #2 and Doe #3, who were freshmen. He coordinated and led French Department activities

such as the French Table and French Movie Night, was administrator of the French Department

website, and ran the social media accounts for the LSU French Club. He registered the LSU

French Club with Campus Life on or about August 26, 2019, acted as its president, and

maintained control of its social media accounts. Social media posts from 2019 and 2020 show

numerous photographs of Dr. Russo with d'Espalungue and undergraduate students at several

events for the French Department, the French Club, and/or AJFS.

73.     D'Espalungue was allowed to maintain his positions as Vice President of the Department

of French Studies Graduate Student Association and as a Senator in LSU Student Government.

74.     Thus, post-arrest, d'Espalungue had positions which not only gave him continued contact

with female undergrad and grad students, but also increased prestige and perceived power over

other GAs, including Doe #4 and Doe #5.

75.     Shortly after news of the rape arrest, Dr. Russo met individually with department faculty

and grad students, including Does #4-6. She told them that d'Espalungue was "innocent,"[15] that

LSU considered him a student in good standing, that his privacy must be protected, and that they

were not allowed to discuss the criminal charges due to "FERPA"[16] and "Dean's orders."

---

[14] D'Espalungue worked as an assistant to the language coordinator, then as a teaching assistant, and after his rape arrest on October 4, 2018, as research assistant to the Chair of the Department of French Studies.
[15] She told one grad student, "he is innocent for reasons I can't tell you."
[16] FERPA is The Family Educational Rights and Privacy Act which protects the privacy of student records. It does not apply to public news reports of criminal arrests.

76.     Doe #6 relayed the content of these conversations to Dean Blanchard soon after they occurred. He responded that he had not given any such orders and said he would correct the message, but no corrections were issued by him or by Dr. Russo.

77.     During her one-on-one meeting with Dr. Russo around mid-October 2018, GA Doe #4 reported that d'Espalungue had made numerous offensive comments about her body and her marital status. Dr. Russo responded that he was just complimenting her, she should feel flattered, and it was probably due to "cultural differences." This response and other behaviors and comments made Doe #4 afraid to report d'Espalungue to the Title IX office for fear of retaliation.

78.     In a meeting with Dr. Russo, Doe #5 stated that d'Espalungue had made offensive comments about her body and her weight in front of other students. Dr. Russo replied it was wrong of him, but she took no action.

79.     In a pedagogy class Dr. Russo was teaching to graduate students about this time, Dr. Russo asked the class whether anyone felt "uncomfortable around Ed," but she prefaced it by saying he was not guilty and that "this is a complete misunderstanding." She then asked d'Espalungue to videotape classes that other grad students were teaching to check their interaction with undergrads. When Dr. Russo asked Doe #5 if d'Espalungue could videotape her class, Doe #5 responded that she was "not OK with that." Dr. Russo replied, "well, you don't think he did what they're saying he did?"

80.     Dr. Russo made it clear to faculty and grad students within the Department that anyone who complained about d'Espalungue, including complaints of sexual harassment or hostile educational environment, would be immediately out of favor with the Chair.

81.     Between October 27 and November 8, 2018, Professor Doe #6 and Dean Troy Blanchard exchanged a long series of text messages in which Doe #6 reported ongoing harassment by d'Espalungue, that four students had complained so far; that d'Espalungue was "very aggressive;" that written statements had been given to Kate Jensen, Director of Graduate Studies; that students were afraid to openly complain due to Russo's "dismissive treatment;" that one student feared for her degree and her career; that when another student – known by Russo to be a sexual assault survivor - complained to Russo about d'Espalungue attending undergraduate movie night, Russo responded that she "is doing this to herself and needs to get over her

14

trauma;" Russo also told her that d'Espalungue was in good standing, and that Dr. Russo was not

going to remove him from department events because "he is innocent."

82.    The text messages were as follows:

   a.    (October 27, 2018) Doe #6 "I spoke with my student this am. She fears
         repercussions if she comes forward in a way that is not anonymous. This
         student knows of at least 2 others who have experienced harassment – and she
         knows one of them will not come forward."

   b.    Dean Blanchard responds that Jennie Stewart with Title IX will reach out to
         her.

   c.    (October 30, 2018) – Doe #6: "Some of our grad students are considering
         doing a petition to get E removed as Vice President of their student
         association. Do you know how they might go about that?"

   d.    Dean Blanchard asks if they have bylaws and if Jennie Stewart reached out.

   e.    Doe #6 responds, no, Stewart had not contacted her, and adds, "I just know
         there are three for sure. They fear reprisals."

   f.    There is no response from Dean Blanchard to this text.

   g.    (November 1, 2018) Doe #6: "A third student came to me this afternoon. I also
         met w Kimberly [Davis] from the Title IX office. The student today mentioned
         a 4th student from a different program. *They are all fearful and apparently E
         is very aggressive.* And honestly it is appalling that E is still the VP of the grad
         student association. This is terrible for our dept." There was no answer to this
         text.

   h.    [Between November 3 and November 5, texts are exchanged trying to set up a
         phone call between Doe #6 and Dean Blanchard.]

   i.    (November 5, 2018) Doe #6: "Hi Troy. * * * I have additional info and was
         wanting to check in with you about next steps the grad students can envision.
         Kate Jensen [Director of Graduate Studies] is also aware of the situation and
         has copies of the letters students sent me detailing the harassment they
         experienced and the lack of response from the chair. If you can talk tonight
         buzz me back and I will call from Atlanta when we land (about 9pm your
         time)."

   j.    Dean Blanchard: "Hi. I met with the title 9 person today. If the students have
         concerns, they need to reach out to the title 9 office. I can help them make the
         contact."

   k.    Doe #6: "Ok. They definitely do have concerns but they are worried about
         losing their anonymity and being compromised in the dept. One of them told
         me she didn't dare speak up against the chair's decisions because she feared
         for her degree, her future career. Just got off the phone w a student who is
         having panic attacks. Gloves off let me quote her: "Edouard came to the
         undergraduate movie night. This student left and called Addie saying it was
         inappropriate for him to be there in a setting w undergrads. Addie told the
         student she "is doing this to herself and needs to get over her trauma." Also
         that E is in good standing, that Addie is not going to remove him from dept
         events, and that he is innocent. Then asked the student to accompany her to a
         meeting w you tomorrow. Student refused. She wants to control the narrative
         but fears reporting Addie. Plane door closed I have to turn my phone off. . ."

   l.    (November 7, 2018): Doe #6 reports that she doesn't know if the grad students
         will file formal reports to the Title IX office. "They are working through their

experiences with this issue and the way it has been handled in Department of French Studies. . ." [Does #4 and #5 eventually did make formal complaints]. "And the way Addie is *reprimanding students* for having a reaction to a **totally unacceptable** situation. . . I know their experience is not my own and not my fight. But I am not going to leave students hanging. They deserve representation and support. *They deserve a safe workplace. As long as Edouard is allowed to be a senator, VP of the grad student association, and coordinator of (and attendee at!!) French table and cinema club, the students are not being protected. If the point of removing his teaching assistantship was to protect undergraduates, then he should also be prevented from attending any undergrad events or interacting with that student population.* I wanted to write to you to explain my own involvement and my advocacy for these students who have been put at risk. *They deserve better than the dismissive treatment they are getting, and which is **creating a hostile workplace.*** (emphasis supplied).

m.  (November 8, 2018 @ 6:09 a.m.) – (Dean Blanchard) (*Note: as will be seen infra,* this is one day after Associate Dean Hicks met with Russo and d'Espalungue and was assured d'Espalungue was "not leading anything" and that he was "taking classes, helping Dr. Russo w/activities – research, projects."[17] Later on November 8th, d'Espalungue sends out an invitation to Does #2 and 3 inviting them to French Movie Night. Dean Blanchard write, "Hi, Rosemary. Please ask the students to call me (8-8274) or come to my office. I can walk them over to the Title IX office. I've worked with Title IX a good bit and can connect them to all the available resources."

83.     In the meantime, on November 1, 2018, Professor Doe #6 met with Title IX Graduate Assistant Kimberly Davis ("Davis") and reported that four students had experienced sexual harassment from d'Espalungue, and that his behavior was "*inappropriately sexualized for work and school environments*" and there were "*concerns for female student safety*" (emphasis added).

84.     Davis' notes of her meeting with Doe #6 include the notation, "Possibility of making report anonymously – ask Jennie/Jeff" and "spoke w/one student who knew of 3 students besides her – I will absolutely not come fwd * Fear of retaliation."[18]

85.     Doe #6 also reported that "although Edouard was removed from teaching classes following his arrests, he continued to lead the French Table and hold positions in the French graduate student organization and LSU student government."[19] She relayed that Dr. Russo had stated that d'Espalungue "was a very fine young man and all of this is probably a misunderstanding."

---

[17] *See* 00235918_LM Notes with J Hicks, in Title IX file of Doe #4 (Handwritten notes of Lindsay Madatic, Deputy Title IX Coordinator for Employees, HRM, dated January 17, 2018 which documented a meeting on November 7, 2018 between Associate Dean Jason Hicks, Dr. Russo and d'Espalungue.

[18] Davis' typed report of the meeting does not include a reference to "fear of retaliation" which appears in her handwritten notes.

[19] *See* Notes of Kim Davis dated November 1, 2018 contained in Title IX file of Doe #4.

86.     Davis was also given two anonymous written statements of grad students who had experienced ongoing sexual harassment involving d'Espalungue. The statements were written by Doe #4 and Doe #5, who later made their identities known to LSU officials.

87.     The (then anonymous) statement of Doe #4 recounted d'Espalungue's multiple comments about her appearance and marital status, including repeated comments about her "beautiful feet," and an encounter where he stared in the direction of her lap during a meeting and later complimented her on her "pretty watch" as he winked at her. It continued, "On multiple occasions, he has noted how it's 'unfortunate' that I am married, despite my continual rebuttal that I am happily so. I have heard him make comments about other women's bodies, weight, appearance, and relationship status as well. When the chair of the French Department discussed with me the current charges against him, she asked if I had any concerns that I would like to share. I shared these concerns with her, but she continued to tell me how she had never seen such behavior from him. She concluded that I should simply accept these comments as compliments. As such, I do not feel that the behavior is being addressed at the department level."[20]

88.     Doe #6 also gave to Davis on November 1, 2018 an anonymous email from Doe #5.[21] It recounted an incident in which Doe #5, a grad student, witnessed d'Espalungue interacting with one of his students (Doe #2, a freshman ten years younger than him) in an alarming and inappropriate manner.

89.     Doe #5 related the following facts: Doe #5 and d'Espalungue were the facilitators for a French Table (Table Française) event in the student union on or about September 22, 2018 (before d'Espalungue's rape arrest). About halfway through the event, one of d'Espalungue's students, freshman Doe #2, showed up. A few minutes later, the only other student participant (a male) left, and the only students present were d'Espalungue, grad student Doe #5 and freshman Doe #2. D'Espalungue focused all his attention on Doe #2, telling her how comparisons were made in the French language, stating, "for instance, [Doe #2] is more beautiful than [Doe #5]" and "[Doe #5] is uglier than [Doe #2]." D'Espalungue then changed the subject to how men and women interact in the workplace in France, with men often joking and teasing women about their skirts and/or dresses. At this point it appeared that d'Espalungue may have touched Doe #2's dress. D'Espalungue also told Doe #2 that the word "poule" was a pet name male colleagues will

---

[20] Title IX file of Doe #4, file 00235924_Notes from Kim Davis, p. 2.
[21] *Id.*, p. 3.

17

often use for female colleagues. Doe #5 stated, "As someone who has lived and worked in France, I cannot attest to this. [22] I felt it was unnecessary and inappropriate for the conversation and for the student."

90.     Doe #5 concluded her statement, "Perhaps this account is small, but with the student's naivete, I regretted leaving her alone with Edouard. She was enamored of him, and I felt her admiration and naivete was being abused. Signed, A concerned female graduate student."

91.     Doe #5 understood clearly that Doe #2 was vulnerable to sexual harassment and/or assault by d'Espalungue, an employee of LSU in a position of power and authority over Doe #2 as her teacher, and who, by the time Doe #5 submitted her formal statement, had been charged with forcible rape of another young student. Doe #5 submitted her Title IX complaint despite knowing she risked retaliation and reprisals from Russo, which in fact she suffered, and which caused her to drop out of the LSU Ph.D. program despite having completed all coursework. D'Espalungue raped Doe #2 three months later.

92.     On September 27, 2018, only five days after the witnessed encounter between d'Espalungue and Doe #2, d'Espalungue suddenly and without her consent, kissed Doe #2, who was at the time his student. She was 18 and he was 28.[23] Three days later, d'Espalungue was arrested for sexual battery/rape of the 21-year-old ULL student in Rapides Parish.

93.     D'Espalungue ultimately raped Doe #2 on January 31, 2019, and then persuaded her to have a continuing relationship for several months until he began dating the recent high school graduate he had met through his activities with the LSU/AJFS Journal awards ceremony he hosted.

94.     By November 1, 2018, one month after d'Espalungue's rape arrest in Rapides Parish, defendants had actual knowledge of the following facts which Professor Doe #6 reported to Dean Blanchard and to Title IX investigator Kimberly Davis. Davis' report indicates she relayed the information to Jennie Stewart, the Title IX Coordinator, Dean Troy Blanchard and Jennifer Normand, Executive Director of Employee Relations in Human Resources Management (HRM):[24]

---

[22] In fact, "ma poule" can be translated as "honey," "babe," "sweetheart," "pussycat," "baby," "my hen," and as "a girl or young woman, especially a promiscuous one." See online Reverso Translation: https://context.reverso.net/translation/french-english/ma+poule and also Lexico, powered by Oxford, http://forreadingaddicts.co.uk/word-of-the-day/word-of-the-day-poule/35521

[23] D'Espalungue's DOB is September 21, 1990.
[24] See "Kim Davis inquiry" in Title IX file of Doe #4.

a. D'Espalungue, an LSU employee, had engaged in numerous instances of sexual harassment of at least three grad students in the French Department, at least one student outside of the French Department.

b. Eight days before his rape arrest he had been seen having an inappropriate and disturbing interaction with Doe #2, an LSU freshman who was one of his students, at a French Table event he was leading.

c. There was a discriminatory and hostile educational and work environment for female students in the French Department, derision shown toward grad students who complained about d'Espalungue's harassment and/or access to undergrads in a leadership position, and a deep fear of further reprisals and retaliation by Dr. Russo.

d. D'Espalungue's behavior was "inappropriately sexualized for work and school environments" and there were "concerns for female student safety" according to Doe #6.

e. Two statements by grad students (anonymously written by Doe #4 and Doe #5) detailed harassment by d'Espalungue and their fear of retaliation by Dr. Russo if their complaints were made known.

f. Although Edouard had been removed from teaching classes following his arrests, he continued to lead the French Table, French Movie Night, the LSU French Club, and hold positions in the French graduate student organization and LSU student government.

g. D'Espalungue was being protected and enabled by Dr. Russo with the full knowledge of numerous LSU officials with authority to rectify the situation. She had met individually with faculty and students to tell them d'Espalungue was "innocent" and in good standing

The Title IX office declined to launch an investigation.

95.    After the November 1, 2018 meeting between Davis and Professor Doe #6, Davis spoke with Jennie Stewart, the Title IX Coordinator, and wrote, *"while we felt that the situation did not rise to the level of requiring an investigation, efforts should be made to prevent the situation from escalating.* Jennie asked Troy Blanchard (HSS) and Jennifer Normand (HRM) to address the professional concerns." (Emphasis supplied).[25]

96.    On November 7, 2018, Associate Dean Jason Hicks met with Dr. Russo and d'Espalungue, apparently to address "the professional concerns" as recommended by Jennie Stewart. Handwritten notes indicate that Dean Hicks met first with the Title IX Office and then with d'Espalungue and Dr. Russo. Dean Hicks told d'Espalungue and Dr. Russo that there had been additional complaints lodged about d'Espalungue from *outside* the French Department. He "made clear" to Dr. Russo and d'Espalungue that d'Espalungue "shouldn't be in the classroom & why." Dean Hicks "notified him of complaint." Dr. Russo and d'Espalungue told Dean Hicks

---

[25] *See* 00235916_Kim DavisInquiry in Title IX file of Doe #4 (11/1/18 "Meeting with [Doe #6] in her office."

that d'Espalungue was "not leading anything" that he was "taking classes, helcomplping Dr.

Russo w/activities – research, projects." [26]

97.     Dr. Russo's statement to Dean Hicks that d'Espalungue "was not leading anything" was

false. The truth – that d'Espalungue was actively involved in French Table and French Cinema

events where he had contact with undergrads and other female students – was open and obvious

and easily discoverable if LSU had conducted a prompt and reasonable investigation by

inquiring of witnesses *other than* d'Espalungue himself and his known protector, Dr. Russo. No

such reasonable steps were taken because of LSU's official policy of deliberately under-staffing

and under-resourcing its Title IX Office as well as other policies and customs which effectively

dismissed complaints of women. LSU was deliberately indifferent the alarm bells regarding

endangerment of female students and the harassment by d'Espalungue.

98.     In fact, at 3:16 p.m. on November 7, 2018 -- *the very same day* that Dean Hicks met with

d'Espalungue and Russo and accepted their stories that d'Espalungue "was not leading

anything," d'Espalungue emailed undergrads Doe #2, Doe #3 and three other students inviting

them to French movie night the following evening, November 8, 2018, stating:

> Dear all,
>
> A new French movie night will take place tomorrow in Prescott Hall 2d floor),
> movie room from 5:30 to 7pm to catch up the last French Movie night (Tuesday).
> You are all welcome to come. Me and [student] (cc) will guide you to put the
> movie on screen.
>
> Kind regards,
>
> Edouard
>
> *LSU SG Senator*
> *Vice President – French Studies Graduate Student Association*

99.     LSU's failure to investigate promptly and thoroughly and to take remedial action

constituted deliberate indifference which was a substantial factor in causing Does #1-3 to

undergo sexual assaults and/or rape and Does #1-#6 to suffer a hostile educational and/or work

environment within the meaning of LSU's Permanent Memorandum 73 (PM-73) which outlines

LSU's institutional policies addressing sexual misconduct.[27]

---

[26] *See* 00235918_LM Notes with J Hicks, in Title IX file of Doe #4 (Handwritten notes of Lindsay Madatic, Deputy Title IX Coordinator for Employees, HRM, dated January 17, 2018 which documented a meeting on November 7, 2018 between Associate Dean Jason Hicks, Dr. Russo and d'Espalungue.

[27] See Exhibit A, attached. LSU promulgated the first version of Permanent Memorandum 73 ("PM-73") in June 2014 to implement the mandates in the U. S. Department of Education's 2014 Guidance, and it replaced previous sexual harassment policies PS-73 and PS-95. PM-73 was revised in December 2015, August 2020, and again on July 1, 2021 in response to changes in state and federal laws. PM-73 defines "Hostile Environment Harassment" as

100.   The hostile environment involved not only the individual harassment/assaults suffered by Does #1-5, but also the fact that all plaintiffs and many other female LSU students and faculty in the French Department were required to witness the protection and enabling of a known predator who, because he was a favorite of the Chair of the French Department, was allowed to act with impunity in endangering not only LSU students but also high school students.

101.   As a direct result, Does #1-6 suffered severe emotional and mental distress, trauma, and humiliation which constituted a severe, pervasive and objectively offensive environment.

102.   Dr. Russo's active protection and promotion of d'Espalungue worsened the harassment for female students, a fact that was repeatedly reported to LSU officials with authority to rectify the situation. Despite actual notice of these facts, LSU continued to be deliberately indifferent, resulting in physical, mental, emotional, and career harm to Does #1-5 and other female LSU students.

103.   On December 10, 2018, Title IX GA Investigator Davis again met with Doe #6. According to Davis' typewritten report,[28] Doe #6 reported that "the situation with Edouard and other graduate assistants *had escalated* since November;" Dr. Russo "had been giving advantages to Edouard and inserting him in situations where he had perceived power over other GAs;" students did not want to speak to Title IX about their concerns because they feared reprisals "that could impact their funding and professional futures;" nothing had changed in the way Russo handled concerns related to Edouard, "and the unequal treatment had gotten worse if anything."

104.   Jennie Stewart, Title IX coordinator, joined Kim Davis and Doe #6 for a portion of the December 10 meeting, and Stewart gave Doe #6 a booklet entitled "Tigers are Committed" about the PM-73 (Title IX) process to share with students and "offered to meet with students in an informal or more comfortable environment."[29]

105.   In the "Tigers are Committed" booklet, "sexual harassment" includes "unwelcome sexual advances, intimidation, requests for sexual favors, and other verbal or physical conduct of a sexual nature when: (1) submission to such conduct is made either explicitly or implicitly a term

---

"Unwelcome conduct, determined by a reasonable person, to be so severe, pervasive, and objectively offensive, that it effectively denies a person equal access to an education program or activity."

[28] See "Kim Davis inquiry" in Title IX file of Doe #4.
[29] *Id.*

or condition of. . . academic status, receipt of university services, participation in university activities and programs, or affects the measure of a student's academic performance."

106.    Dr. Russo had clearly communicated to Doe #4 and Doe #5 that they and other grad students in the French Department were expected to tolerate d'Espalungue's harassment, or pretend it didn't exist, or they would lose favor with her, thus jeopardizing their funding and professional futures.

107.    On December 12, 2018, Kimberly Davis of the Title IX Office met with Doe #4 and Doe #5 at the Starbucks on Nicholson Drive. No Title IX case creation sheet was made documenting the Title IX complaints. Doe #4 only discovered this when she requested her Title IX records in the spring of 2021.

108.    Doe #5 reported that she had been uncomfortable around d'Espalungue *before* his rape arrest after she had witnessed his inappropriate interactions with undergrad Doe #2 – one of his students -- at a French Table event. She also related d'Espalungue had made a comment about Doe #5's weight in front of other students and that Dr. Russo made clear she believes d'Espalungue was innocent.

109.    At the same meeting with Title IX's Davis on December 12, 2018, Doe #4 reported she "had seen d'Espalungue forcing a student to hug him when she was visibly uncomfortable." She had overheard comments d'Espalungue made to other students, including comments about their weight, race and whether they looked good in an outfit. She avoided d'Espalungue at all costs, had devised alternate paths from the classroom to her office so d'Espalungue does not follow her out of class. Her supervisor had helped her adjust her schedule, so they did not have to work together.

110.    Doe #4 also reported to Davis that she was aware of a person outside of the French Department who had an office on their floor, and that after d'Espalungue was inappropriate with her, she stopped coming to her office. She had also learned that Dr. Russo had told other faculty members that she, Doe #4, "takes things too far." She reiterated what Doe #6 had reported: "Dr. Russo has been very clear that coming forward with concerns about Edouard will not end well for students, and there is much fear among the graduate students about their funding and professional opportunities."[30]

---

[30] See Doe #4 Title IX case file, 00235924_Notes from Kim Davis.

111.    Doe #6 emailed Madatic on December 15, 2018 about the meetings Dr. Russo had held

with faculty and staff "informing all that he is innocent before asking if we have concerns or

issues feeling comfortable." She also advised that there were fears of retaliation: "Obviously,

few people have dared to express any discomfort to her; those who have have been swiftly shut

down."

112.    Madatic responded on December 17, 2018, "thank you for sending. . .I will consult with

my team regarding the appropriate course of action." No action was taken before d'Espalungue

returned to France on December 14, 2020 and none has been taken since.

113.    January 17, 2019, Madatic held another meeting with Doe #6 about d'Espalungue's

activities and conduct. Anissa Chenevert, Senior Employee Relations Consultant/Coordinator

with HRM ("Chenevert") was also present.

114.    Before the January 17, 2019, meeting with Doe #6, Madatic apparently spoke to Assoc.

Dean Hicks and her handwritten notes from that conversation suggest that complaints about

d'Espalungue had been received from outside the French Department.[31] The names "Dari Green"

and "Pitre" are noted. A Google search indicates Dr. Dari Green was an LSU Assistant Professor

of Sociology at the time. Madatic's notes state, in pertinent part:

> Jason Hicks 1.17.2019
> re: French, Dari Green, Pitre
> *got complaints
> *met w/TIX
> *met w/Addie & Edouard 11/7
> *make clear that he shouldn't be in classroom & why
> *notified him of complaint
> *hasn't heard any concerns since then[32]
> *not leading anything – taking classes, helping Dr. Russo w/activities – research, projects
> *touch base with PD
> *check w/Troy – did anything happen after Nov 7 mtg.
> *student Senate

115.    The record thus shows that going into the January 17, 2019, meeting with Doe #6,

Madatic knew that d'Espalungue should not be "leading anything" in the French Department for

the same reason that "he shouldn't be in the classroom," and that Dr. Russo and d'Espalungue

had assured Dean Hicks on November 7, 2018 that d'Espalungue was ***not leading anything.***

---

[31] *See* 00235918_LM Notes with J Hicks, in Title IX file of Doe #4 (Handwritten notes of Lindsay Madatic, Deputy Title IX Coordinator for Employees, HRM, dated January 17, 2018 which documented a meeting on November 7, 2018 between Associate Dean Jason Hicks, Dr. Russo and d'Espalungue.

[32] In fact, Doe #6 had reported on December 10, 2018 that the situation "had escalated" since November. See "Kim Davis inquiry" in Title IX file of Doe #4.

116.    Madatic learned in her meeting with Doe #6 on January 17, 2019, however, not only that

d'Espalungue *was in fact leading French Department events and activities which brought him in*

*contact with undergraduate students*, but that at least four grad students had expressed

complaints about sexual harassment and/or concerns about female safety. Madatic's handwritten

notes state, in pertinent part:[33]

> * He was removed from teaching but left doing undergrad French Table (weekly mtg. of
> undergrads). He was in charge alone w/undergrad & grad students.
> * examples were inappropriate
> * used students' bodies as comparisons
> * He is in charge of movie club. 4 movies last semester
> * met 2 times a wk
> * undergrad event
> * Notes that 2 grad students have reported, 2 other grad students don't want to report.
> * One, Dr. Russo told her he was not guilty, the second stopped taking courses. Kim
> Davis has their info. Dec. 2018
> * Concerns: chair; Jennie – didn't want to investigate. His role in dept – VP of Dept of
> French Grad Student Assoc SGA.
> * What (*sic* want) women being harassed being taken seriously

117.    The notes also reflect that Doe #6 reported Dr. Russo had told one grad student that

d'Espalungue is innocent and if she had concerns "they are invalid."[34] She also reported that one

grad student had stopped taking courses due to the harassment and Dr. Russo's protection of

d'Espalungue.

118.    During the January 17, 2019, meeting, Madatic revealed to Doe #6 that the complaints

about d'Espalungue were ***"so plural*** that the identity of any particular complainant could well

remain private." This statement was documented in an email Doe #6 sent to Doe #4 and Doe #5

on the same day. The email also indicates that HRM was coordinating with the Dean and Title

IX office to discuss "possibilities for the situation."

> First, let me say that HR seems to be taking the complaints about Edouard seriously.[35]
> Lindsay cannot divulge what steps will be taken, but she is meeting this afternoon with
> [Assoc. Dean] Jason Hicks and will discuss possibilities for the situation in our dept. She
> mentioned a possible meeting with Title IX and Russo.
>
> She also mentioned (when I brought up the widespread fear of reprisals) that even though
> HR can't promise confidentiality, *the complaints against E are so plural* that the identity
> of any particular complainant could well remain private.
>
> I don't know what will happen next or if there is any kind of justice to be served in taking
> the process to HR. But Lindsay did mention that it would be incredibly helpful if you
> could make a statement. (I told her you had both spoken with Title IX back in December,
> so she is going to try to get those notes.) If you can contact her (lmadat2@lsu.edu) with
> your account/s, and encourage any other students whom you know have been "recipients"
> of Edouard's unwanted attentions to come forward as well, that would go a long way

---

[33] See file "00235930_AC_[ Doe #6]_notes (1)" in Title IX file of Doe #4.
[34] *Id.*
[35] In fact, no action was taken, consistent with LSU's official policy, customs and procedures, of dismissing or minimizing complaints of sexual harassment and taking no action.

toward getting this taken as seriously as it can be. I know you have both already done a
lot; please know your energies are appreciated and your experiences valued.

119.    Madatic sent an email to Dean Blanchard after her meeting with Doe #6 on January 17,

2019 in which she states that Doe #6 shared two statements "from graduate students who

reported that Edouard made them uncomfortable" and that she understood these "are the exact

concerns she shared with you all in the fall. And I understand these concerns were appropriately

addressed by you and Jason in a meeting on November 7…"[36]

120.    Madatic either failed to report to Dean Blanchard that d'Espalungue was still leading

French Department activities with undergrads, or this information was ignored, despite the fact

that Dean Blanchard and Assoc. Dean Hicks had instructed Dr. Russo and d'Espalungue on

November 7, 2018 that he *should not be leading anything*.

121.    On January 24, 2019, Associate Dean Jason Hicks met with Dr. Russo to discuss

complaints that d'Espalungue still had sanctioned contact with other students in the French

Department. Dr. Hicks sent an email the same day to Madatic with a copy to her supervisor,

Jennifer Normand, Executive Director of Employee Relations, and Dean Blanchard, which

stated,

> Hi Lindsay, I am following up on a request you and Jennifer Normand asked of me
> in our last face-to-face meeting. I met with Dr. Adelaide Russo today—Chair of
> French Studies—and she informed me that Edouard d'Espalungue d'Arros *is not
> performing any sort of service where he may have contact with other students. So, he
> is neither teaching in the classroom nor doing other activities that will knowingly put
> him in contact with other students (e.g., staffing the French Table or the LSU Night
> of French Cinema).* His current graduate assistant duties involve helping Dr. Russo
> with research activity and making updates to the French Studies Department website.
> Edouard is working on his Master's thesis and he does plan to enter PhD candidacy
> if accepted by the department. Finally, Dr. Russo reported not knowing any updates
> regarding Edouard's legal case.[37]

122.    Dr. Russo's statement that d'Espalungue "was not performing any sort of service where

he may have contact with other students" was false. By this time, the record *was replete with

complaints about d'Espalungue leading French Table and French Movie Night events with

undergrads on behalf of the French Department.* LSU officials with authority to rectify the

situation had actual notice of these activities and that Dr. Russo was protecting d'Espalungue.

LSU's failure to launch a prompt and thorough investigation constitutes deliberate indifference

in these circumstances. Instead, LSU officials simply inquired of d'Espalungue and his protector,

---

[36] See "00235927_RE_ Concerns in French email with Troy" in Title IX file of Doe #4.
[37] *See* "00235913_E dEspalungue dArros email with Jason Hicks.pdf" in IX file of Doe #4.

Dr. Russo, and accepted their representations without question, completely ignoring the multiple women who had come forward.

123.   With full knowledge of Dr. Russo and other responsible officials at LSU, d'Espalungue continued to organize and direct events for French Table, LSU Night of French Cinema, LSU French Club, and the LSU Department of French Studies throughout 2018, 2019 and 2020. He registered the LSU French Club with Campus Life in September 2019 and maintained control over its social media accounts. Social media posts show photographs of Dr. Russo with d'Espalungue and undergrads at a number of these events.

124.   As executive director of AJFS, president of the LSU French Club, and personal assistant to the Chair of the LSU Department of French Studies, d'Espalungue constantly advertised and promoted these organizations interchangeably, for instance, AJFS and the LSU French Club shared a single booth at "Fall Fest" on October 11, 2019. [38]

125.   D'Espalungue's involvement as the face of the French Department in activities and social media posts was repeatedly raised in complaints to responsible officials, yet they failed to act.

126.   On February 28, 2019, Lindsey Madatic emailed Doe #6, with copies to Dean Blanchard and Associate Dean Hicks, and stated, "You also indicated that Edouard was still a part of the public face of French Studies even though he was not supposed to be serving in areas where he may have contact with other students. *After discussing these concerns with Dr. Hicks and Dean Blanchard, I was able to confirm that Edouard was (and is still) not performing any sort of service where he may have contact with other students;* however, he is still in the program. Dr. Hicks and Dean Blanchard also informed me that you previously shared the same student complaints with them, and they addressed those concerns appropriately in the fall of 2018. As such, our office will not take any further action in those matters."[39]

127.   Once again, this email reflects LSU's official policy of deliberate indifference to reports of sexual harassment and endangerment of LSU students – in this case by one of their employees who had been arrested for forcible rape. D'Espalungue was openly and publicly performing services which brought him into contact with other students, with Dr. Russo's full support.

---

[38] See AJFS Twitter post, "We are proud to announce that the @AJFS_LA partners with the LSU Department of French Studies for Fall Fest on October 11, 2019!" Accessed on September 11, 2021 at https://twitter.com/AJFS_LA/status/1182460895651254273

[39] *See* page 3 of file 00235917_LM email with Chair contained in Title IX folder of Doe #4.

LSU's refusal to launch an investigation under the circumstances constituted deliberate indifference to gender discrimination and retaliation.

128.    Three separate LSU departments (Title IX, HHS, and HRM) with authority to rectify the complained-of conduct and eliminate the hostile environment and threats to the safety of female students at LSU failed to act. Although they continued to receive reports of sexual harassment, sex discrimination, hostile environment, concerns that women were not being taken seriously, and fears of reprisals in the French Department related to d'Espalungue and the protection Dr. Russo was providing him, they did not so much as launch an investigation.

129.    LSU officials with authority to rectify the situation and who *personally* were involved and had actual knowledge of plaintiffs' complaints included:

      a.  Jennie Stewart, Title IX Coordinator;

      b.  Jeff Scott, Title IX Lead Investigator;

      c.  Kimberly Davis, Title IX Graduate Assistant Investigator;

      d.  Daniel DeLuca, Assistant Director of Student Advocacy & Accountability,

      e.  Troy Blanchard, Dean of the College of Humanities and Social Sciences (HSS);

      f.  Jason Hicks, Associate Dean of HSS;

      g.  Jennifer Normand, Executive Director of Employee Relations with HRM;

      h.  Lindsay Madatic, Deputy Title IX Coordinator for Employees and Assistant Director of Employee Relations with HRM;

      i.  Anissa Chenevert, Senior Employee Relations Consultant/Employee Relations Coordinator;

      j.  Kevin Bongiorni, Director of Undergraduate Studies, and

      k.  Katharine Jensen, Director of Graduate Studies/French Studies.

130.    This ongoing failure to investigate and lack of action by LSU allowed d'Espalungue to harass and assault with impunity, compromising the safety and rights of female LSU students and resulting in physical, mental, emotional, educational, and career harm to Does #1-5 and many other female LSU students.

**Launch of the American Journal of French Studies – an LSU Program**

131.    In March of 2019, with the help of the LSU Department of French Studies and Dr. Russo,

D'Espalungue launched what was billed as an "LSU academic journal"[40] called the American

Journal of French Studies (AJFS).

132.    It was no accident that the name "American *Journal of French Studies*" mirrored that of

LSU's own *Department of French Studies*. AJFS, LSU, and the LSU Department of French

Studies openly and publicly allied their institutional identities. Innumerable in-person events,

flyers, emails, social media posts, and PowerPoint presentations marketed AJFS as an LSU

publication and project. LSU professors appeared in photos and videos with d'Espalungue which

he then used to sell AJFS memberships and/or sponsorships.[41]

133.    On March 20, 2019, the Executive Director of CODOFIL sent out an email blast

promoting AJFS to high school French teachers across Louisiana. On information and belief, the

email was sent at Russo's request. The email claimed that AJFS was to be published by the LSU

College of Humanities & Social Studies. The email identifies D'Espalungue as "Ed Darros" –

one of several aliases he had begun using after his rape arrest.[42] and the address listed was

d'Espalungue's graduate student office at Hodges Hall, LSU.

134.    The CODOFIL letter stated (in French): "American Journal of French Studies. What is

that? This is the new journal soon to be published by the College of Humanities & Social

Studies. If you write, if you have poems, short stories, or if your students write, we invite you to

share it with Ed Darros, copied here. The Call for Short Papers ends next Friday, March 22,

2019. If you want to send your items by mail, the address is as follows: American Journal of

French Studies, 4th Floor, R. 449, Hodges Hall, Louisiana State University, College of

---

[40] See Facebook post by Alliance Francaise of New Orleans dated September 3, 2019, with a "flyer" created by AJFS which states, "Meet and Greet with American Journal of French Studies, September 16, 6pm, 1519 Jackson Ave. Presenting LSU's French academic journal which promotes the French language and culture in the United States." https://facebook.com/afneworleans/photos/gm.2307876235993884/2792843597413128

[41] For example, an AJFS Facebook post dated July 13, 2020 features a portion of a video including Dr. Adelaide Russo, Chair of the LSU Department of French Studies, Professor Olivier Moreteau, LSU Law School Professor, and retired LSU Professor Alexandre Leupin (who later became an officer of AJFS when it was incorporated as a Louisiana non-profit on October 7, 2020, while d'Espalungue's Title IX case for sexual assault of Doe #1 was pending). The full video can only be seen by joining AJFS and paying a membership fee of $10 per month or $120 per year. Corporate sponsorships range from a $1000 to $5000, with the latter including "visit Paris and French South Atlantic Coast for a week with AFJS Directors, all costs included, for 3 individuals only."
https://www.facebook.com/AmericanJournalofFrenchStudies/videos/583599079008072

[42] All posts at the AJFS website are by "Ed Darras." An AJFS Instagram post, dated September 28, 2020, identifies him as "Ed Darras" and states he is "Director, American Journal of French Studies." D'Espalungue used "Edward Daras" in his role as a member of Baton Rouge Mayor Sharon Weston Broome's International Relations Commission, "Ed Daras" in an online interview about his AJFS work:
https://www.facebook.com/the821project/posts/2740756039362999 and "Ed Da" for certain social media profiles.

Humanities & Social Studies, Baton Rouge, LA 70803 or by email, to Ed (edespa2@lsu.edu) or

to the newspaper directly (email address). To learn more about this new journal, please read

below."

135.    The next part of the email was a message from d'Espalungue which stated, "[t]he AJFS is

an academic journal, *hosted and funded by LSU* and aims to be a platform to publish the

contributions/poems/short novels of high school and undergraduate students. I am also very

pleased to announce that for this Spring 2019 edition the American Journal of French Studies

(AJFS) will reward the best author with a prize money of $250. The deadline to send

contributions is Friday, March 22nd and they should be between 100 and 1000 words. *By this*

*way, high school students from 8th to 12th grade can participate.* All the contributions accepted

will be published (online and printed). It is a great opportunity given to high school and

undergraduate students to be published in a peer-reviewed journal. It will also give students

access to a large community of francophone writers since every contribution accepted will be

published on a website. I also think high school teachers would be very proud of them once they

see their student's works in such a journal."

136.    D'Espalungue recruited several young LSU female students to help him with the journal,

including Doe #2 and Doe #3 who were his former students. Most were 8-10 years younger than

d'Espalungue and were impressed by his influential position in the French Department as

organizer of French Table and French Movie Night events, leader in the LSU French Club,

research assistant to the Chair of the Department, and elected positions in LSU student

government organizations.

137.    With the help of his "team," d'Espalungue created an AJFS web page and established

numerous social media accounts for AJFS on Instagram, Facebook, Twitter and others, where he

regularly posted about AJFS and its "partnership" with LSU and/or the LSU French Department,

or simply merged their identities.

138.    D'Espalungue gave the young students titles and important roles with AJFS, and they

were initially enthusiastic, especially since it had been launched with the endorsement of the

LSU Department of French Studies and CODOFIL and was "partnering" with other important

persons and organizations involved in French language and culture in Louisiana and beyond,

including Louisiana's Lieutenant Governor.

139.    On April 2, 2019, d'Espalungue texted Doe #3 that she needed to leave the journal, but he needed to meet her in person to explain. When she met him, he began touching her all over against her will. She got up and told him she was going back to her dorm room. He followed her and outside her door began grabbing and kissing her. She repeatedly tried to turn her head away and break away. She finally was able to break free and went inside, locking herself in her dorm room.

140.    On numerous other occasions, d'Espalungue threatened Doe #3's position on the journal and told her she would be kicked out if she didn't comply with his sexual demands, which constitutes *quid pro quo* sexual harassment. [43]

141.    After CODOFIL's large email blast to all Louisiana high school French teachers, LSU allowed d'Espalungue to go into high schools to promote LSU, the LSU Department of French Studies and AJFS while other LSU clubs were denied this opportunity due to concerns of "legal liability."[44]

142.    On August 29, 2019, d'Espalungue went to three high schools in Lafayette, Louisiana: 1) Lafayette High School, 2) St. Thomas More Catholic High School, and 3) Ascension Episcopal School. In addition, as Director and editor-in-chief of AJFS and president of the LSU French Club, he participated in meetings with elected officials and other influential individuals, posted photos and videos of AJFS activities on multiple social media platforms, and frequently mentioned AJFS's affiliation with LSU and/or the LSU Department of French Studies.

143.    In these activities, d'Espalungue used various aliases to avoid having media reports about his rape arrest surface. Among his aliases are "Ed Da",[45] "Edward Daras,[46] and "Ed Darras."[47]

---

[43] "[Q]uid pro quo sexual harassment — i.e., when tangible adverse action results from an underling's refusal to submit to a higher-up's sexual demands — is, by its very nature, intentional unequal treatment based on sex." *Doe v. Mercy Catholic Medical Center*, No. 16-1247, 2017 WL 894455 (3d Cir. Mar. 7, 2017). Title IX regulations have codified this ruling by making quid pro quo sexual harassment a *per se* instance of sexual harassment which requires no showing that the conduct was "severe, pervasive, and objectively offensive." Title 34 C.F.R. §106.30  *See Mary M. v. North Lawrence Community Sch. Corp.*, 131 F.3d 1220, 1226-27(7th Cir. 1997) (stating that age difference between a harasser and victim creates an assumption of reasonable fear of reprisal if the victim does not submit to the harasser's demands).

[44] An LSU undergrad who worked on the AJFS journal requested permission to promote an LSU Cajun language club in high schools but was denied permission due to issues of "legal liability."

[45] "Ed Da" is currently used for d'Espalungue's Facebook profile as of September 24, 2021: https://www.facebook.com/ed.da.123829

[46] D'Espalungue used the alias "Edward Daras" in his role as a member of Baton Rouge Mayor Sharon Weston Broome's International Relations Commission, although his appointment and service with this commission no longer appears in internet searches.

[47] See AJFS web page here https://american-journal-of-french-studies.com/author/ed ("All posts by Ed Darras") accessed September 11, 2021. Also see June 19, 2020 Facebook post by AJFS, "Interview with the Director of AJFS

144.    LSU's alliance with and support of AJFS provided a high confidence factor for Louisiana high school and middle school teachers who then encouraged their students to submit French essays to the journal. Teachers could have no doubt that AJFS was an LSU program when they read that cash prizes were handed out at "the AJFS Awards Ceremony at the LSU French House, Ogden Honors College."[48]

145.    The AJFS web page from 2019 through at least the spring of 2021 stated, "Through our partnership with Louisiana State University, we organize an Awards Ceremony each year in April at the French House – Ogden Honors College."[49]

146.    The first AJFS awards ceremony was in fact held at LSU on April 25, 2019, immediately following awards ceremonies for the Department of French Studies in the "French House." A photo of Dr. Russo standing nearby as d'Espalungue stands at the lectern was posted the same day on the AJFS Facebook page.[50]

147.    During and after the awards ceremony, d'Espalungue repeatedly expressed his sexual and romantic interest in one of the high school essay contestants who attended the ceremony, and within a few weeks d'Espalungue had seduced her into a sexual relationship.

148.    The AJFS/LSU program and activities which involved multiple LSU undergrads and high school students persisted for more than two years, openly, publicly and with public support of LSU employees and officials with authority to rectify the situation, even though d'Espalungue was ostensibly not supposed to be in contact with other LSU students due to his rape arrest and pending charges.

149.    AJFS continues its activities to this day. Its website still carries a Baton Rouge address, and friends and associates of d'Espalungue continue to host social activities in Baton Rouge and Lafayette.

---

by Jahi Mackey." The post states the interview is with "our Director and Editor-in-Chief, Ed Darras." Accessed September 11, 2021 at https://www.facebook.com/AmericanJournalofFrenchStudies/videos/305729370587235/

[48] Marketing flyer dated May 12, 2019 with "LSU" printed on the left edge in gold over a purple background.

[49] This claim was removed sometime in the spring of 2021, likely as the result of continuing complaints by various plaintiffs to LSU officials. This is evidence that someone at LSU was still in touch with d'Espalungue, who fled to France on December 14, 2020, after his suspension from LSU and in an attempt to escape prosecution for rape in Rapides Parish.
[50] See https://facebook.com/AmericanJournalofFrenchStudies/photos/645188492587079, accessed September 11, 2021. Screenshots available if it is removed.

150.    Knowledge that LSU's deliberate indifference was allowing d'Espalungue to contact and endanger not only LSU undergrads, but high school students - with impunity - contributed to the loss of a normal educational experience for the student plaintiffs.

151.    D'Espalungue still has accesses high school and undergraduate students, including LSU students, through AJFS, a project that was launched, promoted, and financed with the help of LSU and the LSU Department of French Studies, and marketed as a program of LSU.

152.    D'Espalungue, via AJFS, continues to solicit French language essays from high school and university students, offering cash prizes and publication in the Journal of "all the contributions accepted."[51] For the 2021 competition, students were invited to submit essays as well as "personal stories, academic papers, poems, theatre pieces, short novels, etc." Students are invited "to reflect on a persona question: what social issues are you most passionate about?" Among many suggested topics are drug and alcohol abuse, prostitution, emotional and mental health, healthy relationships, social anxiety and childhood obesity.

153.    Applicants are required to provide their name, email address and phone number.[52]

154.    As recently as August 27, 2021, LSU and LSU French Studies were currently listed as Institutional Partners on the website of the American Journal of French Studies.

155.    Other respected and influential organizations, individuals, and schools are also listed as partners of the American Journal of French Studies. Some or all of these entities who have unknowingly allowed a serial sexual predator access to young women are involved with d'Espalungue because of his elevated status at LSU, his promotion by Dr. Russo and the LSU Department of French Studies, and because of the deliberate indifference of LSU to actual notice of systemic sexual harassment, discrimination, and the danger he posed to young women.

156.    In May 2019, d'Espalungue distributed a flyer promoting AJFS. The flyer had a purple edge and "LSU" printed in yellow. It states, "Ed Darros, a LSU graduate Student and assistant of the Chair of the LSU Department of French Studies, founded in March 2019 the American Journal of French Studies (AJFS) with the support of the LSU Student Government." It further listed bullet points of AJFS activities.

157.    On August 25, 2019, d'Espalungue interviewed Lieutenant Governor Nungesser as a representative of LSU and AJFS, using the alias "Ed Darros." Darros/d'Espalungue mentions

---

[51] American Journal of French Studies website, "2021 Call for Short Papers," https://american-journal-of-french-studies.com/concours-d-ecriture-2021, accessed September 22, 2021, screenshots available.

[52] Id.

that "a lot of students" reach out to him to join the French Club and in hopes of being published

in the journal and notes that endorsements from high-ranking officials encourage them to

recognize it as a good opportunity. The Lieutenant Governor concludes the interview by stating,

"Anything I can do to help you or LSU, count me in."

158.    On or about August 26, 2019, d'Espalungue registered the French Club with LSU

Campus Life and officially became its president, and maintained control of its social media

accounts. Social media posts from 2019 and 2020 show numerous photographs of Dr. Russo with

d'Espalungue and undergraduate students at a number of events for the French Department, the

French Club, and/or AJFS.

159.    On September 13, 2019, LSU Campus Life sent out invitations for students to join the

LSU French Club which was being led by d'Espalungue.

160.    Throughout 2019 and 2020, d'Espalungue continued leading LSU French Department

events in direct contact with LSU undergraduate female students including Doe #2 and Doe #3,

was regularly using aliases, and representing LSU.

161.    On January 2, 2020, the AJFS Twitter account announced, "Remember @LSU is the

place where everything started for the @AJFS_LA! A big thank you to all our friends, followers

and partners who helped us to publish stories of young francophone writers! We look forward to

working with you again in 2020!"

162.    On April 3, 2020, an AJFS tweet[53] claimed AJFS won a grant from the Cultural Services

of the French Embassy. The tweet read "The @AJFS has been ranked this year in the top 10

projects in the nation by the Cultural Services of the French Embassy! We are so proud of the

support we have received from @ltgovbillynungesser and @louisianaltgov who helped us to

promote our "savoir-faire! #LSU" The image used in the tweet read:

> **American Journal of French Studies**
> **French Club * Louisiana State**
> **University, Baton Rouge (LA)**

163.    The French Embassy's post,[54] however, stated that the LSU French Club was awarded

the grant for a talent show called "LSU's Got French Talent." Once again, the identities of the

---

[53] See https://twitter.com/AJFS_LA/status/1246194089474830337
[54] The French Embassy's post about the 2020-2021 project winners is here: https://frenchhighereducation.org/grants-and-programs/5900-france-campus-awards/selected-projects It shows that the "LSU French Club" won second prize.

LSU French Club and AJFS were merged to financial and personal benefit of d'Espalungue, all done publicly, in the open, and with LSU's full knowledge and support.

164.    AJFS was promoted by d'Espalungue, Russo, and LSU as an integral program of the LSU Department of French Studies, often interchangeable with the LSU French Club (a registered club with Campus Life).[55]

**Fall of 2020 – Title IX case and Multiple other Title IX Reports**

165.    On September 6, 2020, as a direct result of LSU's deliberate indifference to actual notice that d'Espalungue posed a severe risk of harm to female students and had an ongoing pattern of sexual harassment, and as a direct result of LSU's official policy of gender discrimination as described herein, d'Espalungue raped LSU undergraduate student Doe #1.

166.    D'Espalungue and Doe #1 met in late August of 2020 on the LSU campus when he stopped to help her with a flat tire on her bicycle. He gave her his phone number and later she texted to thank him for the help. They spoke on the phone a few times and made plans to meet. She insisted on a public place, so they met for a picnic. D'Espalungue began asking about her sexuality and started touching her leg. She told him she wanted to go home and he offered to drive her. Instead of driving to her apartment, however, he drove to his own apartment, where he raped her. Doe #1 did a rape kit and the rape was reported to the Title IX Office on September 8, 2020. The Title IX office transferred the case to the Student Advocacy and Accountability Office (SAA) because the rape had occurred off campus. After an investigation, Daniel DeLuca, Assistant Director of SAA informed the parties on November 9, 2020, that d'Espalungue had been suspended from November 9, 2020, through December 31, 2021 for Sexual Misconduct, Endangerment, and Disorderly Conduct resulting from her rape[56].

167.    D'Espalungue appealed and the matter was set for hearing on November 20, 2020, before a University Hearing Panel via Zoom. At the hearing, d'Espalungue was represented by an

---

[55] Under Title IX regulations, 34 CFR §106.44, a school's "education program or activity" includes "locations, events, or circumstances over which the recipient exercised substantial control over both the respondent and the context in which the harassment occurs" as well as "any building owned or controlled by a student organization that is officially recognized by a postsecondary institution."

[56] LSU defines "Sexual Misconduct" in PM-73 as "(e.g. sexual assault, stalking, dating violence, domestic violence, sexual exploitation, retaliation, etc.)" It defines "sexual assault" in the same document as "sexual contact or penetration without consent" with three subcategories: 1) Forcible Sex Offenses include "Forcible Rape, Forcible Sodomy, Sexual Assault with an Object, Forcible Fondling;" 2) "Sex Offenses, Non-forcible includes sexual intercourse as a result of incest or statutory rape; and 3) "Sexual Assault also includes sexual battery as defined in La. R. S. 14:43.1."

attorney while Doe #1 was accompanied only by a Lighthouse advisor.[57] The hearing went on for many hours, during which Doe #1 had to endure questioning and cross-examination by her attacker, and her advisor was not allowed to speak. This procedure violates Title IX regulations adopted August 14, 2020.[58]

168.    D'Espalungue's attorney raised questions about Doe #1's behavior after the rape and argued that it wasn't consistent with being raped. The hearing was traumatic and caused severe mental, emotional pain to Doe #1.[59]

169.    On November 20, 2020, the University Hearing Panel notified Doe #1 that it had found d'Espalungue guilty of Sexual Misconduct and Endangerment and upheld the suspension through December 31, 2021. D'Espalungue's appeal to the Dean of the College of Humanities and Social Sciences was denied on December 11, 2020.

170.    In the meantime, on October 5, 2020: Dr. Russo sent an email to faculty and graduate students in the French Department directing them to report any Title IX complaints to her and she would decide whether they should be reported to Title IX. She wrote, "[a]ll instances covered by these regulations must be reported to the Department Chair, and I will instruct you to contact the Dean's Office and the Title IX office if you have reason to lodge a complaint." (Emphasis added).[60]

171.    This instruction was a violation of LSU's own policy and Title IX regulations. In no situation is it permissible to instruct students that they are barred from reporting sexual harassment, sexual assault, or retaliation to the Title IX Coordinator.

172.    Dr. Russo's instruction was reported to LSU officials with authority to address and/or rectify the situation, but no investigation was launched, and no action was taken.

173.    In the fall of 2020, at least six LSU female undergraduate students conferred about filing formal complaints with the Title IX office regarding d'Espalungue's ongoing pattern of sexual

---

[57] The Lighthouse is a confidential interpersonal violence prevention and advocacy program which offers free services to the LSU campus community See https://lsu.edu/shc/wellness/the-lighthouse-program/index.php

[58] Effective August 14, 2020, Title IX regulations require postsecondary institutions to hold a live hearing with the opportunity for each party's advisor to conduct cross-examination of parties and witnesses. § 106.45(b)(6)(i).

[59] The notice of UHP hearing had an attached document entitled "What to Expect." It stated, in part, "You have the right to one advisor and may bring that person with you to the hearing. The advisor (even if an attorney) *may not represent you. The advisor may not be directly involved in the case and may not serve as a material observer.*

[60] The Husch Blackwell Report contains a similar instance, p. 134: "One Department reported that a dean had directed faculty and staff to report sexual misconduct to the dean and not the Title IX Office."

misconduct which they had experienced and/or witnessed. Five students moved forward, including Doe #2 and Doe #3.

174.   On November 6, 2020, Doe #3, called the Title IX office to file a formal PM-73 (Title IX) complaint of sexual misconduct against d'Espalungue. The initial case notes state that d'Espalungue was "abusing position of power to make sexual remarks to female students... unsolicited physical contact; student says she cannot get into clubs because she is uncomfortable with this student as he is involved in clubs as well. She was working for a French journal that he started; student saw that he would do it to other people; she thinks that other PhD students and department knew of his behaviors." The remedy Doe #3 requested was "Removal from school because she feels he continues to involve more people."

175.   On November 10, 2020, Stewart spoke to Doe #3 by telephone. Doe #3 reported that d'Espalungue had created "journal in the French department – partnership, he's still in charge of that and French Club;" Doe #3 was no longer affiliated with the journal; she refused to meet with him alone, under table touching leg;" "Texts received where he was asking her to come over, saying things appear to be inappropriate." Apparently, Stewart asked a representative of the Lighthouse Program to contact Doe #3.

176.   On November 16, 2020, Stewart conducted a Zoom conference with three undergrads who had experienced and/or witnessed sexual harassment by d'Espalungue, including Doe #2 and Doe #3. During the Zoom conference, Doe #3 sent her own written statement as well as statements by two other LSU undergraduates who were not on the Zoom call, with their permission. Thus, there were five students who filed Title IX complaints on November 16, 2020.

177.   In her written statement, Doe #3 documented in more detail d'Espalungue's *modus operandi* and how he abused his position of power within the LSU French Department in attempting to seek *quid pro quo* sexual favors from her, and she feared from other female LSU students, particularly young undergrads, in return for access to LSU programs such as the French Club and AJFS, which he controlled. (*See* ¶ 32-34 *supra* for more details).

178.   Stewart's notes contained in the Title IX file of Doe #3 describe instances of *quid pro quo* harassment by d'Espalungue as well as a Clery Act "sexual assault" violation which met the definition of "fondling" contained in 20 U.S.C. 1092(f)(6)(A)(v). Neither of these instances of

36

sexual harassment require a showing that the harassment was "severe, pervasive and objectively offensive."[61]

179.    In particular, Stewart's notes of the Zoom conference with Doe #3 on November 16, 2020 state as follows:

> [Doe #3] - he was an instructor in french, left because he has a case, a few months later he asked her to be on french journal, she got involved because she didn't want [Doe #2] involved individually, Ed tried to touch, kiss and ask inappropriate questions. [Doe #3] was removed from journal and he said he needed to meet her late at night in person to explain why (*assaulted - grabbing her rear, kissing her,*), he doesn't want guys on the journal. She tried to not let other women be alone with him, she knows the assault has happened to other women, he would yell at her. *He kicked her out of French related groups, continuously would ask her to sleep with him and when she declined he would tell her and others she had mental problems.* She and others feel the french department protects him. When started on french journal said he had connections and would help her.

180.    Forcible Fondling is defined in LSU's PM-73 as "The touching of the private body parts of another person (buttocks, groin, breasts) for the purpose of sexual gratification, forcibly and/or against that person's will (non-consensually) ..."[62]

181.    As noted, any form of *quid pro quo* harassment—that is, an employee conditioning any educational opportunity or benefit on the granting of sexual favors—constitutes a *per se* violation of Title IX, regardless of its severity or pervasiveness.[63] The same is true of sexual harassment that constitutes an offense under the uniform crime reporting system of the FBI.

182.    As noted, d'Espalungue was an LSU employee as research assistant to the Chair, and he also controlled the LSU French Club and AJFS, which was a *de facto* program of LSU through the LSU Department of French Studies and was openly marketed and touted as such.

183.    Doe #3's written statement sent to Stewart on November 16, 2020, relates:

   a.    She met d'Espalungue when she was a freshman LSU student in his French 1001 class and her first impressions were positive. After he "disappeared" she and other students learned of the rape arrest but were unsure whether he could be guilty.

   b.    In the spring of 2019, Doe #3 accompanied her friend, Doe #2, to French Movie Night where d'Espalungue met them. Shortly thereafter, d'Espalungue recruited Doe #2 and #3 to help him get AJFS off the ground, promising they would have

---

[61] Under Department of Education regulations, 34 C.F.R. 106.30(a) there are three categories of sexual harassment. Two of them address serious violations that they are considered harassment *per se* and do not require a showing that the conduct was "severe" or "pervasive." The first category is *quid pro quo* harassment in which a teacher or employee conditions "the provision of an aid, benefit, or service of the recipient on an individual's participation in unwelcome sexual conduct." The second category includes certain conduct included in the Clery Act and/or the Violence Against Women Act. Here, d'Espalungue committed both a *quid pro quo* violation and a Clery Act "sexual assault" violation because it met the FBI's definition of Forcible Fondling ("The touching of the private body parts of another person for the purpose of sexual gratification without the consent of the victim").

[62] Exhibit A, LSU PM-73, p. 8.
[63] *See* Title IX regulations, 34 C.F.R. §106.30(a)(1) which includes within the definition of sexual harassment conduct in which "an employee of the recipient conditioning the provision of an aid, benefit, or service of the recipient on an individual's participation in unwelcome sexual conduct."

good resume material and he would also give them a cut of the money they would make selling the printed journals.

c.  On March 28, 2019, they created the Instagram account for AJFS (@AJFS_LA)

d.  "Our usefulness, though, was not about [French] fluency to him, it was about who we were, and the fact that we were young and willing to listen to him."

e.  At some point Doe #2 asked about the rape case "and he told her the girl was just religious and had 'mental issues,' so she assumed the best and continued to agree to work with him."

f.  They began to meet but he started asking questions about her romantic interests. "He consistently got too close to me and started to touch me in ways that I did not find appropriate, yet I assumed maybe it was a culture difference."

g.  D'Espalungue repeatedly asked Doe #2 and Doe #3 to meet him to "talk about the journal," but when they would meet, he would not bring up the topic.

h.  When they would meet, d'Espalungue "would touch and rub my legs underneath the table, when my friend could not see." On another occasion, d'Espalungue reached behind Doe #2 to touch and rub Doe #3's side.

i.  D'Espalungue would become angry when Doe #3 expressed her discomfort or exasperation, or alternately state he would never be interested in Doe #3 and/or he meant nothing by it.

j.  [*Quid pro quo*] [64] On April 2, 2019, d'Espalungue texted Doe #3 and told her she "needed to leave the journal" and that he needed to meet with her to explain. Doe #3 "felt very invested in the journal, since I had been there when it was started." When they met in person and she asked why she needed to leave the journal, "he said it was not true; with this he made it clear that he just wanted to meet me. He started touching me all over. I got up and told him I wanted to go back to my dorm before walking away." He followed her and then started pulling her close so she could not get away. He kept trying to kiss her as she repeatedly turned her head away. She finally broke away and went inside. "I remember making sure the doors were locked and trying to make sense of the situation."

k.  After this, d'Espalungue began recruiting other young female students to help with AJFS "who were similar to me, young and – even slightly – involved in French or language study."

l.  D'Espalungue started telling other AJFS members that Doe #3 was crazy and had "mental issues," and tried to prevent her from discussing his behavior with anyone else.

m.  D'Espalungue would berate Doe #3 at various events promoting AJFS "where he would decide I had done something wrong or unacceptable.

n.  D'Espalungue would alternate between telling Doe #3 she was "below him" and he was not interested in her and trying to convince her to come to his apartment or give him her address "**even though I repeatedly brought up our almost 10 year age gap and our power difference and how uncomfortable these things made me.**"

o.  [*Quid pro quo*] – On another occasion, d'Espalungue got Doe #3's address from a mutual friend and came over. When she opened the door, "he instantly walked to my bedroom and tried to get me to follow. I refused to be alone with him, however, and texted my roommate at the time [to] stay with us. *"He threatened*

---

[64] *See* footnotes 44 and 62, *supra.*

38

*my position with the journal when I would not comply, saying it showed I 'was not a good friend,' 'the others would meet him,' he wasn't sure he could trust me, etc.* even though at that point I had made it more than clear that he was ONLY my boss. Throughout this time when he was persistently continuing to make advances on me, he was engaged in multiple other relationships, but this made no difference to him. I was kicked out of the journal many times when I would bring these things up, yet he hated thinking that I was free from him and able to talk as I wanted, so he would convince me to come back each time. I also did not feel right leaving my friends in the journal alone, as some of them did not know what he was capable of, or even that he had a previous case and they should therefore be wary of him. If I did tell them, it was often the same scenario of shock but disbelief."

p.  Doe #3 eventually cut off all contact with d'Espalungue after a final instance of groping and nonconsensual sexual conduct. According to her written statement submitted to Stewart, the last major event Doe #3 attended before cutting off all contact with d'Espalungue was an LSU performance event she attended with d'Espalungue and a few other graduate students. "When we got there, I sat in between a female grad student and him. He began to continuously touch me and slid his hand ALL the way up my leg right in front of the others. I got up and left for a while. If the others noticed something was off that night, they didn't say anything to me. At the restaurant afterwards, he continued to touch and make advances. I think I hit or shoved him; that happened a few times, but he would always take it as a joke, even though I was clearly exasperated. At that point I had had enough, I told them someone else could drive him home and I left."

q.  Doe #3 also attached more than 50 pages of screenshots of text messages d'Espalungue had sent her with inappropriate, sexualized and predatory language, including his claim to be collecting nudes from all over Louisiana "like a boardgame."

184.    In the Title IX case record of Doe #3, Jennie Stewart's notes document that Doe #3 reported sexual assault by d'Espalungue within the meaning of the Clery Act, and also *quid pro quo* sexual harassment. The notes state: "Doe #3 was removed from journal and he said he needed to meet her late at night in person to explain why (assaulted – grabbing her rear, kissing her)[65] he doesn't want guys on the journal. She tried to not let other women be alone with him, she knows the assault has happened to other women, he would yell at her. He kicked her out of French related groups, continuously would ask her to sleep with him and when she declined he would tell her and others she had mental problems. She and others feel the French department protects him. When started on French journal said he had connections and would help her."

185.    As noted, Doe #3 sent to Stewart during the November 16, 2020 Zoom meeting two additional written statements from female LSU students. One of them recounted multiple instances in which d'Espalungue had sexually harassed and assaulted her ("we were all chatting and, seemingly out of nowhere, he grabbed my face and tried to kiss me.;" "as soon as he shut

---

[65] Stewart apparently conflated two different instances reported by Doe #3. Although d'Espalungue did engage in unwelcome sexual conduct the evening they met to "discuss the journal," the Clery Act violation involving Fondling - grabbing her buttocks - was a different incident.

the door and I had opened a Russian language book, he began to make more sexual comments. He asked me to sit on his lap and continued with comments like, 'I know you want to kiss me', 'how about you kiss me every time I get a word right', along with many unwanted touches regardless of how many times I told him 'no' as this was going on.." "* * * I think his presence and unwillingness to accept no as an answer for unwarranted advances is dangerous to many young women attending the university.").[66]

186.    Thus, during the November 16, 2020 Zoom meeting, Stewart spoke with three female LSU students and received written statements from two others (and a written statement from Doe#3, who was also on the call). Stewart was informed that d'Espalungue had sexually assaulted several of the complainants, had sexually harassed all of them, was recruiting and/or grooming high school students through AJFS (an "LSU partner" on their website at the time), and had slept with at least one high school student who had submitted an essay for an AJFS contest, thus severely impacting their educational opportunities on the basis of sex, and creating a hostile educational environment.

187.    With respect to the information regarding d'Espalungue recruiting/grooming high school students through AJFS, touted as an "LSU partner," and having sex with at least one of them, Jennie Stewart responded, "oh, well, that's not LSU policy," and "he didn't do anything illegal." These statements were shocking and traumatizing for Doe #2, Doe #3 and the third LSU undergrad who was on the call.

188.    The Title IX office closed all five Title IX complaints filed November 16, 2020 without investigation even though d'Espalungue's suspension ends December 31, 2021, the complaints involved separate incidents of *per se* harassment and sexual assault, and the complainants specifically informed the Title IX office that d'Espalungue continued to meet and potentially groom high school students through the journal which was marketed, advertised and promoted as an LSU project/publication.

189.    On December 11, 2020, Doe #4 filed a formal Title IX complaint (PM-73) reporting that she had been retaliated against by Dr. Russo for reporting d'Espalungue for Title IX concerns; that Dr. Russo had instructed her, other GAs and faculty in the French Department that any Title IX concerns should come to Dr. Russo.

---

[66] See Title IX file of Doe #3.

190.    Title IX Coordinator Jennie Stewart held a Zoom meeting with Doe #4 on December 11,

2020. Doe #4 transmitted the following information to Stewart which described in detail an

ongoing, continuing hostile work and educational environment from 2018 through 2020:

    a.  She repeated her earlier experience of being harassed by d'Espalungue and Title
        IX deciding "behaviors didn't meet threshold and case remained in HR."

    b.  In a Fall 2019 meeting Russo told Doe #4 in front of Doe #5 that she "didn't need
        to be causing **drama** that ensued last year. Any reports that are Title IX shall
        come to me." Russo then dismissed Doe #5 from the meeting on the pretext that
        the conversation would turn to Doe #4's dissertation. Once they were alone, Dr.
        Russo began discussing d'Espalungue's rape case in Rapides Parish and stated
        that the charges were going to be dismissed.

    c.  Dr. Russo instructed that "if there was any discontent recognized among students
        toward Edouard that the students should tell Russo.

    d.  In 2019, Doe #4 was paid only half her salary one month, and when she contacted
        the administrative assistant, Russo berated her, said she had "no right" to contact
        her assistant, and that she would not be paid because she was working "on
        volunteer basis." The Director of Graduate Studies eventually spoke to Russo and
        the salary was restored.

    e.  There were many smaller issues; Doe #4 felt targeted by Russo, told she was rude,
        disrespectful and "didn't need to speak in meetings."

    f.  "Felt she had to seek therapy and leave her job to complete her degree. Russo is
        not on her dissertation committee, but Doe #4 is still fearful of retaliation.

191.    On December 18, 2020, Title IX Lead Investigator Jeff Scott contacted Doe #4 to set up a

follow-up Zoom call for January 12, 2021. During the call, Doe #4 described an ongoing hostile

work and educational environment comprised of a continuing series of hostile and dismissive

remarks, insults, and disrespect shown to Doe #4 by Russo after she complained of

d'Espalungue's harassment, making her life a "living hell."

192.    On January 12, 2021, Doe #4 told Scott that she and d'Espalungue both started their

respective programs in the French Department in 2017.[67] From the beginning, he made

inappropriate remarks to her and other females in the graduate program. When the rape arrest

was reported in October of 2018, Dr. Russo spoke to each grad student individually, asking them

about any concerns. Doe #4 shared her concerns about inappropriate comments and Dr. Russo

responded, "she should take Edouard's comments as compliments and they should be there to

support Edouard." Doe #4 filed a complaint with HRM. Afterwards, Dr. Russo became

disrespectful to Doe #4 and would not speak to her. Russo told her that Edouard was "actually

innocent," and she should not cause "any drama" and should support Edouard. On one occasion,

---

[67] The Title IX record says "2018" but this may have been a typo.

Dr. Russo told Doe #4 to quit being a "know it all" and not to speak so much in meetings – that Doe #4 did not need to cause any more issues. In carrying out her work responsibilities, Doe #4 had followed her supervisor's instructions, but Dr. Russo told her she didn't have authority to do the things requested. Dr. Russo made Doe #4's life "a living hell." As a result, Doe #4 had to quit her job working for the Assistant Language Coordinator. On another occasion, Doe #4's paycheck was withheld for one of her graduate assistant jobs in 2019. When she inquired, Dr. Russo told her she was working on a "volunteer" basis, although Doe #4 had been paid for the same job in 2018.  Doe #4 was forced to make multiple phone calls to seek assistance. Finally, another professor called Russo and she apparently reversed her instructions and Doe #4 was paid. In October 2020 Russo sent email to all grad students and faculty stating that "they needed to report any Title IX concerns to the dept. chair (Russo) first before they do anything else." Doe #4 provided a copy of the email to Scott.

193.    Once again, nothing came of this report of Title IX violations.

**D'Espalungue's Escape to France, Indictment, Bond Revocation**

194.    On November 23, 2020, three days after an LSU University Hearing Panel imposed a one-year suspension on d'Espalungue for sexual assault and endangerment of Doe #1, d'Espalungue's criminal defense attorney in Alexandria filed a Motion for Permission to Travel asking that d'Espalungue be allowed to leave the country to spend Christmas in Paris with his family. The motion cited d'Espalungue's high GPA, his position as Research Assistant to the Chair of the Department, alleged that he was elected "Programs Chair for the LSU International Student Association (ISA)," and "Vice President for Programs of the LSU International Cultural Center (ICC)," [68] and stated that "in November of 2019 he was appointed by Baton Rouge Mayor Sharon Weston Broome as a member of the Mayor's International Relations Commission.[69]

195.    The Motion for Permission to Travel was granted allowing d'Espalungue to depart for France on December 14, 2020 and return to Louisiana on December 27, 2020 notwithstanding

---

[68] D'Espalungue's name (real or alias) does not appear in the history of the ISA or the ICC. See https://www.lsu.edu/intlpro/icc/isaiccofficers.php.

[69] In November 2019, d'Espalungue was in fact appointed to Baton Rouge Mayor Sharon Weston Broome's International Relations Commission under the alias, "Edward Daras." This could be seen on the website at late as of May 7, 2021 at this URL, however his name has since been removed: https://www.brla.gov/2162/International-Relations-Commission-IRC

the fact that France is a non-extradition country for its own citizens, and the court originally had required d'Espalungue to relinquish his passport as a condition of his $100,000 bond.

196.    On December 14, 2020, d'Espalungue departed for France and has never returned.

197.    On February 23, 2021, twenty-nine months after the rape of the ULL student and two months after allowing d'Espalungue to escape to France, the Rapides Parish District Attorney finally presented the case to a grand jury. The grand jury issued a true bill indicting d'Espalungue for Third Degree Rape.

**D'Espalungue continues AJFS/LSU activities from France, including harassment**

*198.*    Despite being an indicted fugitive serial rapist suspended from LSU and living in France, as of February 24, 2021, d'Espalungue was still in control of the LSU French Club social media accounts, was hosting and planning LSU French Club meetings with undergrads, was moderating their interaction through the GroupMe app and had just received a $1000 grant from the LSU French Department for AJFS.

199.    In addition, even though d'Espalungue left the country on December 14, 2020, he continued his ongoing pattern of harassment at LSU, all of which has been reported to the LSU Title IX office on multiple occasions.

200.    On February 10, 2021, Doe #4 emailed Jeffrey Scott of the Title IX office.  She wrote, "I have a concern regarding the complaint against Edouard D'Espalungue. I know that he was suspended from the university due to these complaints. However, he continues to work for the American Journal of French Studies, which is a journal partnered with the university and created through the university. I am highly concerned about this because the journal works with undergraduates and high school students. I have observed his inappropriate behavior with the students who participate in activities with this journal. I wanted to share these concerns. I am not sure if this falls under the jurisdiction of the Title IX office."

201.    Jeffrey Scott responded via email on the same date that he had followed up with SAA and was told "even though Edouard created the American Journal of French Studies, it is no longer affiliated with LSU." Doe #4 responded, "The website still lists LSU as a partner and donor." Scott did not answer.

202.    Doe #4 emailed Scott on February 24, 2021: "I have just learned that the Department of French Studies just awarded the journal a $1000 grant – which seems to be an affiliation. This concerns me very much." Scott did not reply.

203.    The award of $1000 grant from the LSU French Department to AJFS serves as additional

evidence that AJFS was a "program or activity" of LSU within the meaning of Title IX, and that

d'Espalungue's *quid pro quo* conduct conditioned AJFS involvement on participation in

unwelcome sexual conduct involved an "aid, benefit, or service of the recipient" within the

meaning of Title IX regulations.

204.    Later on the same day, February 24, 2021, Doe #4 emailed Scott as follows:

> Since this morning, even more information has come to light. I have evidence that
> Édouard continues to host and plan LSU French Club meetings with undergraduates
> and moderates their group me [GroupMe]. Though he has officially been removed as
> the organizer of the organization, he continues to act as if he is the leader of the
> group. I can send photographic evidence of this. This is highly frustrating for me as it
> shows how the department continues to skirt Title IX regulations in favor of a
> predatory student rather than protecting the students at large. Could you please
> update me on the case regarding the department's handling of the situation? [70]

205.    Scott responded a few minutes later, "Thanks for this information.  I have shared it with

Jennie Stewart our Title IX Coordinator to review.  If you wish, feel free to also contact Jennie

directly at jstewart@lsu.edu." There is no follow-up response from Stewart or Scott.

*206.*    Doe #4 met with Stewart (Title IX) and DeLuca (SAA) on February 25, 2021 and was

told they could do nothing to stop d'Espalungue from claiming affiliation with LSU, ***even***

***though he was using his platform to recruit young women and high school aged girls.***

207.    LSU once again took no action, following its official policy of gender discrimination and

showing deliberate indifference in the face of actual knowledge of ongoing sexual harassment of

LSU students as well as high school students.

208.    On the same day, February 25, 2021, Doe #6 also urgently reached out to various LSU

officials with authority to rectify the situation, sending separate emails to Dr. Russo, Associate

Dean Jason Hicks and Kevin Bongiorni, Director of Undergraduate Studies, with copies to all of

these, as well as Kate Jensen, Director of Graduate Studies. One email stated:

> I was encouraging my students to sign up for the French club and two of them asked
> to speak with me after class. They told me the club is still being run by Edouard –
> who as I understand has been suspended from LSU following legal investigations
> around sexual harassment – and further that he has *blocked* certain female students
> (who either refused his advances or reported him) from the French club group me,
> and the Instagram and Facebook pages. If true, this is a ***very bad*** position for
> the dept to be supporting, at a time when LSU is being scrutinized for its handling of
> sexual predation and misconduct of all types, including various units' responses to
> reports of these incidents.

209.    Doe #6's email to Dr. Russo stated, in part:

---

[70] February 24, 2021 @ 3:44 p.m. email from Doe #4 to Jeffrey Scott with LSU Title IX office.

If Edouard is still in charge of these groups, even nominally, or is claiming any association of any French social activity he is doing with our department, we stand to come under disciplinary action, not to mention lose potential majors and minors. (One student told me she dropped the French major last year because of his harassment; and that if we were face-to-face right now she would drop the minor too, so she would not have to see him.)

* * * . . . this is *in our house* and, for some reason, still happening even after he has been removed from the university. Pardon me for being very blunt here, but supporting a sexual offender - never a brilliant option to begin with - is not a good look for our department in the post-USA-Today-article era. We need to support our students and make sure our department is a safe place.

210.    Dr. Russo responded to Doe #6, claiming that a different student was President of the

French Club:

. . . she just met with me yesterday about the grant that the French Club received from the French Cultural Services to organize a talent competition. Edouard d'Espalungue is no longer in the country and no longer has any affiliation with the university. He was instructed that he cannot use his former LSU address or email.

Dr. Russo admitted that she was "unaware of the French Club's social media presence" and that

the students should "come see me, or better yet, file a Title IX report directly." She copied Jennie

Stewart of the Title IX office on her response.

211.    The "grant" from the French Embassy Cultural Services is the same one that

d'Espalungue had claimed in a tweet on April 3, 2020, was awarded to AJFS, with an image that

merged AJFS identity with that of the LSU French Club. And as will be seen, as late as February

25, 2021, d'Espalungue was still in control of the LSU French Club social media platforms,

claiming to be "founder and president of the LSU French Club," claiming to speak for Dr. Russo,

and blocking Doe #2 and other LSU students who were reporting him or who had rejected his

advances.

212.    On February 25, 2021, Doe #2 checked to see what was happening in the French Club

2020/2021 GroupMe and was surprised to see she had been removed. She also discovered she

had been removed from the French Club LSU Facebook page. After she regained access through

another LSU student in the French Department, she scrolled through the messages and saw

d'Espalungue had removed her on January 22, 2021.

213.    Rather than say anything about being removed, Doe #2 posted about her love of

languages. On February 26, 2021, d'Espalungue sent multiple messages to Doe #2 on WhatsApp

about the French Club award and how "motivated" she sounded. She replied she was in class.

Doe #2's boyfriend then posted on the AJFS Instagram page about d'Espalungue being

suspended from the university. D'Espalungue responded by sending multiple texts to Doe #2

45

threatening to file a criminal complaint against her if she didn't get her boyfriend to "stop

harassing me."

214.    A series of texts ensued with d'Espalungue stating that his is the founder and president of

the French Club and was helping Dr. Russo who "needs more students involved" and he was

"just trying to put you on a team." Screenshots of d'Espalungue's texts of February 26, 2021,

state:

> As far as the group, I am the president and founder of this club so f*** off with your
> BS accusations; Hey I am done w this conversation, this guy only wants problems. I
> have no academic authority on you [Doe #2], I was acting like you seems to b very
> motivated in the group and Pr. Russo does have a need for more students involve is
> found in the project so, forget my offer. I was genuinely trying to put you on a team,
> but this is just going too far.

215.    Doe #2 forwarded all of the information with screen shots to Stewart in the Title IX

office, which comprise her second Title IX complaint. She summarized d'Espalungue's

harassment and control over LSU clubs and educational programs as follows:

> Bottom line: He acts and says he is president of the LSU French Club, as well as
> uses LSU for his journal (American Journal of French Studies.
>
> - He affiliates LSU with his Journal by noting on his Instagram that it is
>   "hosted by @LSU" and lists the address as his former office in Hodges Hall.
>
> - He is admin of the French Club GroupMe and I believe that he is (still) the
>   admin of the Facebook group for French Club LSU.
>
> - He claims he is the president of the club and still acts as such (organizing
>   meetings, etc.).
>
> - The groupme for the club is directly linked from French Club LSU page.
>
> - The group is LSU students, mostly female.

216.    Doe #2 asked Jennie Stewart on March 1, 2021, how she could protect young women

who were interacting with d'Espalungue on the LSU French Club sites and apps. She asked what

she could legally divulge about d'Espalungue's rape arrest and harassment in an effort to warn

other females. She stated that she felt a *"moral obligation to inform the women members*

*especially, as they cannot make an informed decision in regard to whether to follow him or not."*

217.    Stewart responded that LSU could do nothing, and recommended that a "new" French

club be organized and the "community members on the GroupMe, Facebook, Instagram, etc.

have to decide not to follow Ed. There's no action to be taken by administration but the

community can choose not to follow him, which I hope people will do."

218.    The Title IX office tasked with protecting students and assuring their equal educational

access told victims it was their responsibility to handle harassers themselves, and to protect each

other. Despite the clear distress, educational disruption, and potential danger d'Espalungue was causing female LSU students, no investigation was launched, no action was taken.

219.    In fact, d'Espalungue had previously registered "French Club LSU" with Campus Life and invitations had been sent out to students on September 13, 2019, which stated "Edouard d'Espalungue d'Arros has invited you to join the organization French Club LSU." From that point forward, until sometime in mid-2021, d'Espalungue was in charge of the LSU French Club Facebook account and related accounts. There is still an Instagram account, but it appears the Facebook account has been removed.[71]

220.    Doe #2 and other students formed "Le Cercle Francais" as an alternative LSU club.

221.    By this time, d'Espalungue had already removed Doe #2 from the French Club GroupMe app, the WhatsApp and the AJFS_LA Instagram page and she no longer had the ability to try to move "the community" away from the predator's control.

222.    Notwithstanding the fact that d'Espalungue had been arrested for rape of a young ULL student in Rapides Parish, was suspended for the rape of a young LSU student, was physically barred from the LSU campus, was a fugitive from justice, and had been in France since December 14, 2020, he continued to plan student events at LSU through his control the social media platforms for the LSU French Club and for AJFS which continued to publicly hold itself out as a program of LSU.

223.    Up until at least March 1, 2021, LSU officials with authority to rectify the situation had actual notice that d'Espalungue continued to be in control of and lead activities for the LSU French Club and LSU's "academic journal" AJFS; and that he was harassing and blocking students who had reported him or had rejected his sexual advances. Even though d'Espalungue was not physically on LSU's campus, LSU had sufficient control over d'Espalungue's activities because a responsible official could have alerted LSU's own students and the public that d'Espalungue had been suspended and was not a spokesman for LSU.

224.    The harassment d'Espalungue engaged in was severe, pervasive and objectively offensive and it effectively barred Does #1-5 and other LSU students from educational opportunities and benefits; LSU was deliberately indifferent to the harassment.

---

[71] The last post at the Instagram account was November 12, 2020. It points to the former Facebook page account which is no longer available:
www.facebook.com/groups/FrenchClubLSU/?ref=share.

225.    To this day, AJFS continues to hold events in Baton Rouge, Lafayette and elsewhere, as

well as on Zoom, charging healthy fees, all with the full knowledge and tacit agreement of LSU.

Having been launched by LSU and the LSU Department of French Studies with the help of

CODOFIL and other French language institutions – upon information and belief at the urging of

Dr. Russo and others at LSU – AJFS continues to have access to young high school students and

to profit at the same time, through LSU's deliberate indifference and official policy of gender

discrimination.

**Husch Blackwell Report – Systematic Failures, Official Policy of Discrimination, Fraudulent Concealment**

226.    LSU's long-term, systemic institutional failures with respect to Title IX policies and

compliance were the subject of an in-depth review published on March 3, 2021, by the Husch

Blackwell law firm, entitled "Louisiana State University Title IX Review" (hereinafter "the

Report").[72] A copy of the Report is attached as Exhibit B.

227.    The Report concluded that: "The University's Title IX Office has never been

appropriately staffed or provided with the independence and resources to carry out Title IX's

mandates."[73]

228.    The Report also found: "Institutional reporting policy and training have been unclear for

years," and that "we found deficiencies in a variety of different matters," not just in the Athletics

Department.[74]

229.    The Report stated five reviews in the past five years had flagged problems with LSU's

Title IX processes, including training, staffing and and compliance – three from external

consultants, one from the University's Office of Internal Audit, and one from a University task

force. LSU leadership implemented few of the recommendations.[75]

230.    The "Recommendations" portion of the Report lists numerous policy failings with respect

to sexual harassment which clearly were not oversights or accidental. The previous consulting

reports, audits, and task force recommendations had been ignored, and repeated calls for

additional guidance and resources from within the Title IX Office itself went unheeded:

---

[72] *See* Exhibit B, Husch Blackwell Report, p. 12, footnote 47 which states, "For those complaints that fall within PM-73 [LSU's policies on sexual misconduct] and involve employees, Stewart notifies the appropriate Human Resources representative to respond to the complaint."

[73] Husch Blackwell Report, p. 4. A copy is also available online at https://www.lsu.edu/titleix-review/ (accessed September 26, 2021).

[74] *Id.*, p. 4.

[75] *Id.*, p. 36. "As discussed below, University leadership's response to these red flags was lackluster."

Throughout this report, we have stressed that in many ways the employees tasked with these important responsibilities were not served well by the leadership of the University. Institutional policies were unclear, edicts were issued by supervisors that conflicted with policy, employees were overburdened with vast institutional roles and not provided with appropriate resources, calls for additional resources went unheeded, concerns were not responded to, etc. As part of this review, we have interviewed several employees who acknowledged making mistakes and emotionally shared that they were trying their absolute best under exceptionally difficult circumstances.[76]

231.    A key finding of the Husch Blackwell report is that LSU failed to appropriately staff its Title IX Office despite many "alarms" by the Title IX office itself.[77]

232.    During all periods relevant to this suit, LSU had only one Title IX Coordinator, Jennie Stewart, and one "lead" investigator for a campus with over 34,000 students.

233.    Stewart was hired in September 2016 and was LSU's first "full-time" Title IX Coordinator. This was nearly five years after the U. S. Department of Education ("Department") issued the 2011 "Dear Colleague Letter" stressing the broad responsibilities of the Title IX Coordinator for "identifying and addressing any patterns or systemic problems that arise during the review of Title IX complaints;" and recommending they "not have other job responsibilities that may create a conflict of interest."[78]

234.    Stewart realized within her first six months that LSU's "Title IX staffing was woefully behind peer institutions and that she needed additional resources and staff to avoid a bevy of potential harms including 'litigation, damages, reputation costs, lost enrollment, [unfavorable] media, harm to folks who've chosen LSU.'"[79]

235.    She gave a slide presentation on September 23, 2016, to President Alexander, the general counsel and the CFO requesting at least $329,000 to properly staff and train the Title IX office, including funds to hire a lead investigator, 4-5 other investigators, and at least two graduate assistants. She also sought funds for training and travel. Her slide presentation cited "mental stress and exhaustion (doing more than 1 job)" as well as "emotional toll on our staff." [80]

236.    President Alexander responded to the slide presentation by stating words to the effect of: "We don't disagree with any of this . . . it gives us a good idea of where we need to go." Stewart drafted a job description for a lead investigator, but the position was not filled for 19 months.

---

[76] *Id.*, p. 137.

[77] Husch Blackwell Report, p. 36.
[78] U.S. Dep't Ed. Office for Civil Rights, "Dear Colleague Letter: Sexual Violence" (2011). A copy of the 2011 Dear Colleague Letter, which was rescinded by the Department in September 2017, is available at http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.

[79] Husch Blackwell Report, p. 36.
[80] *Id*, p. 42-43.

The Report states, "That appears to be the only additional resource that came from this presentation."[81]

237.    In March 2018 LSU hired Jeff Scott to serve as "Lead Title IX Investigator" for the LSU System, and he assumed responsibility "for investigating *all* Title IX complaints for LSU students at all nine campuses." Scott told Husch Blackwell attorneys that he received assistance from Deputy Coordinators to do "some of the 'legwork' prior to him opening investigations," and that "[i]nvestigations of complaints against employees continued to be handled by the University's Employee Relations department of Human Resource Management."[82]

238.    Stewart and Scott preside over a "Title IX Case Management Team" which meets once a week to discuss the status of pending Title IX cases and is currently composed of representatives from the Title IX Office (Stewart and Scott), The Lighthouse Program, LSUPD, the Office of the Dean of Students (including representatives from Student Advocacy and Accountability and the CARE Team . . .), and Residential Life. University administrators affiliated with the team universally described the Title IX case load as "overwhelming" and the current staffing as "unsustainable."[83]

239.    The Husch Blackwell Report found that "The University's Title IX Office has never been appropriately staffed or provided with the independence and resources to carry out Title IX's mandates. We have identified concerns that the Office has at times not handled those matters reported to it appropriately. Again, while the *USA Today* article focused primarily on Athletics, *we found deficiencies in a variety of different matters.*"[84]

240.    LSU also ignored Department guidelines on staffing and conflicts of interest. At all times relevant to this suit, Stewart reported directly to LSU's Office of General Counsel, a reporting line which is "rife with conflict of interest."[85] This arrangement ignored the Department's guidance that "designating the same employee to serve both as the Title IX Coordinator and the general counsel (which could include representing the school in legal claims alleging Title IX violations) poses a serious risk of a conflict of interest."[86]

---

[81] *Id.*, p. 43.
[82] Husch Blackwell Report, p. 11. Under LSU's Policy Statement 73 which addresses sexual harassment by employees such as d'Espalungue, "[a]ll complaints of sexual harassment must be reported to the Office of Human Resource Management."

[83] *Id.*, pp. 12-13.
[84] *Id.*, p. 4.
[85] Husch Blackwell Report., p. 141.
[86] *Id*, p. 9.

241.    Furthermore, under LSU policy governing harassment by its employees - Policy

Statement 73,"[87] "[a]ll complaints of sexual harassment [by employees] must be reported to the

Office of Human Resource Management." [88] At all relevant times, Madatic served in a dual

capacity at HRM as Associate Director of Employee Relations and as Deputy Title IX

Coordinator for Employees, roles that were found to present potential conflicts of interest in a

2017 Presidential Task Force report to LSU President F. King Alexander.[89] The Task Force also

noted an unclear "line of command" with respect to the various Title IX Coordinators, stating, "it

is not immediately clear from the organizational charts available from the LSU website who the

various Title IX coordinators report to. The organizational charts (and any related governing

documents) should be revised to make it clear that the various Title IX coordinators do not have

conflicting responsibilities."[90]

242.    The Task Force recommendations "went nowhere." Attorneys for Husch Blackwell were

"unable to find any documentation memorializing how this Task Force report was assessed or

addressed by the leadership of the University."[91]

243.    At all times, LSU failed to develop or adopt policies and procedures regarding proper

investigation and response to sexual harassment, assault, and violence, and failed to provide

policy, procedures, or training for administrators, employees, and students about sexual

harassment and assault.

244.    LSU actively concealed its own misconduct by "going through the motions" of

commissioning task forces, listening to power point presentations of its Title IX Coordinator, and

receiving other reports outlining its many policy failures which resulted in rampant sexual

harassment and discrimination within its university system, all the while intentionally deciding to

ignore the reports and take no substantive action to address the system-wide failures which were

well-documented by at least 2017. The record shows that the staffing and training of the Title IX

---

[87] Attached hereto as Exhibit C.
[88] *See also*, Husch Blackwell Report, p. 12, footnote 47 states, "For those complaints that fall within PM-73 and involve employees, Stewart notifies the appropriate Human Resources representative to respond to the complaint."

[89] President Alexander convened the Task Force "to review our current policies, practices, and procedures as they relate to Title IX and to provide recommendations to the President that reflect campus needs and are informed by nationally-recognized benchmarked practices" were largely ignored.Husch Blackwell Report, pp. 38-42, describes the Task Force and its recommendations which included the statement, "LSU's website also lists Gaston Reinoso as the Title IX Deputy Coordinator for Employees. It appears, however, that Mr. Reinoso may have other job responsibilities in the office of Human Resources Management that might conflict with his duty as Title IX coordinator." *Id*. p. 42. Madatic replaced Reinoso in 2017. She has the same dual job responsibilities in HRM.

[90] Husch Blackwell Report, p. 41.
[91] *Id.*, p. 42.

Office - and its concomitant response to gender harassment and discrimination - could have been substantially improved for the paltry sum of $329,000 in 2016, when Stewart presented a request to the LSU President, general counsel and CFO.

245.    All of this information was intentionally and fraudulently concealed from the public and from plaintiffs until the release of the Husch Blackwell Report on March 3, 2021.

**Who's On First**

246.    D'Espalungue was both an employee and a student at LSU. While various individuals and LSU departments were involved in responding to the multiple complaints about endangerment and harassment, there was a "who's on first" quality to these engagements as a direct result of LSU's failure to adopt and implement effective Title IX policies even after it received specific recommendations from a Task Force in 2017 to do so and had constant requests from the Title IX Office for more staff, resources and infrastructure.[92]

247.    Prior to the rapes and/or sexual assaults of Does # 1-3, Does #4-6 made numerous complaints about d'Espalungue's harassment and endangerment of undergrads, as well as retaliation and the ongoing hostile environment in the Department of French Studies created by Russo. Doe #2, Doe #3, and three other students also made complaints in November 2020 concerning sexual assaults, harassment, Clery Act violations and *quid pro quo* sexual harassment.

248.    LSU officials from four different departments became involved in these complaints about d'Espalungue between 2018 and 2021. Each official was an "LSU official with authority to rectify" the complained-of conduct, and each was deliberately indifferent to the risks, harassment, and hostile environment complaints.

249.    Different complaints were variously addressed by 1) HRM (Madatic, Deputy Title IX Coordinator for Employees; 2) Dean Troy Blanchard and Associate Dean Jason Hicks of the College of Humanities and Social Sciences; 3) the Title IX Office, including Jennie Stewart, the Title IX Coordinator, Jeff Scott, Lead Investigator, and Kimberly Davis, graduate assistant Investigator; and 4) the Student Advocacy and Accountability Office (with respect to the rape of Doe #1).

---

[92] "Shocked at the lack of infrastructure and resources devoted to Title IX" is how Mari Fuentes Martin described it when she arrived in 2016 as the new Dean of Students and Deputy Title IX Coordinator for students. Husch Blackwell Report, p. 10, fn. #30.

250.    No investigation was launched, no interim measures or support services were offered, and no outcomes were reported with the exception of the five Title IX complaints (including those of Does #2 and #3) which were summarily closed in December 2020, after d'Espalungue's one-year suspension had been made final. The closing of these cases further constituted deliberate indifference to gender discrimination at LSU.

251.    Such inaction does not comply with basic due process requirements or Title IX as outlined in its regulations and guidance issued by the U.S. Department of Education, Office for Civil Rights ("OCR").

**DAMAGES: Defendants' Actions/Inactions and LSU's Official Policy of Discrimination**

252.    As a direct and proximate result of the defendants' actions and inactions, and LSU's official policies of gender discrimination, plaintiffs have suffered actual damages including, but not limited to, emotional and physical pain and suffering, mental distress, humiliation, medical expenses for mental and physical health treatment, anxiety, physical assault, denials of access to educational benefit, loss of educational benefit including academic work and scholarship opportunities, loss of income, loss of enjoyment of life, economic damages associated with moving, denial of career advancement and equity pay, and other economic or non-economic damages, for which they are entitled to just compensation.

253.    Does #1-#3 each suffered sexual assault and/or rape which caused severe mental, physical and emotional pain and anguish, anxiety, humiliation, and distress.

254.    Doe #1 endured not only rape, but also a long adjudication process requiring her to repeat details of her rape numerous times and be subjected to hours of cross-examination by d'Espalungue and his attorney at a panel hearing. This was in violation of Title IX regulations adopted August 14, 2020 which require the parties to be represented by advisors who conduct the questioning.

255.    Doe #2's rape by d'Espalungue on January 31, 2019, filled her with shame and confusion. She was a freshman. He had been her teacher. He was ten years older and a prestigious and prominent figure in the French Department. He was also her "boss" with respect to her work on the Journal, which had become important to her. D'Espalungue had started grooming her in September of 2018, and his inappropriate attentions at a French Table event on September 20, 2018, were noted and documented in a Title IX report of Doe #5 later that fall, after d'Espalungue had been arrested for rape of the ULL student. After her own rape,

d'Espalungue convinced Doe #2 to continue their relationship for several months, and then broke it off after he became involved with the high school AJFS essay contestant in the summer of 2019. It was only later that Doe #2 understood that d'Espalungue was a serial sexual predator, and not the charming Frenchman that he passed himself off to be. Despite her own stress, pain, humiliation and anxiety, Doe #2 has spent a considerable amount of time and effort to warn other young women, making multiple reports to the Title IX office, all to no avail. Doe #2 has been deprived of equal access to education and has suffered physical and mental pain, humiliation, and trauma as a direct result of defendants' actions and inactions, as well as LSU's official policy of ignoring and abetting sexual harassment of female students.

256.    Doe #3 was the victim of multiple instances of groping, unwanted touching, *quid pro quo* harassment, and Clery Act violations which included forcible fondling. Doe #3, like her friend Doe #2, was a freshman student and d'Espalungue had been her first French teacher. She suffered confusion, shame, stress, anxiety, physical and mental pain, and was deprived of a normal educational experience. D'Espalungue was her boss, and she felt the work of the journal was important and exciting in the first months. Later, she would attend events so that other young women would not be alone with d'Espalungue, all in a vain effort to protect them from a skillful and experienced predator. D'Espalungue took advantage of her youth, trust, and inexperience as he did with Does #1 and #2, and many other female LSU students.

257.    Does #2 and #3 also spent significant time and effort trying to get LSU to act. They spoke with other victims, obtained written statements, and coordinated a group Zoom meeting with Stewart on November 16, 2020, in which five Title IX complainants stepped forward. Their efforts continued into 2021 regarding d'Espalungue's continued control of LSU French Club websites, his claims that AJFS was affiliated with LSU, and the risk he posed to high school students. All of these efforts came to nothing. In the meantime, Doe #2 and Doe #3 lost many hours and much physical, mental and emotional effort that should have been spent on their college educational experience.

258.    Doe #4 sought counseling in October 2019 due to the unbearable hostile environment resulting from Russo's ongoing retaliation for Doe #4's Title IX complaints about d'Espalungue's harassment and Russo's reprisals. She ultimately gave up her status as a full-time LSU student at the end of the fall semester of 2019. While on campus, the stress caused her to have insomnia and a decreased appetite. For a time, she awoke every hour at night. She suffered

anxiety due to Russo's constant criticism and disrespect, and eventually began taking an anti-

depressant. She is now attempting to finish her Ph.D. as a part-time student living as a permanent

resident outside the United States. Because of these changes, Doe #4 has lost her graduate

assistant positions which had paid for her tuition; lost physical access to the LSU library and

continues to suffer stress and anxiety due to the hostile educational environment, even long

distance. She still fears retaliation from Russo, even though she is not on her dissertation

committee.

259.    The hostile environment Doe #4 experienced involves a cumulative, continuing series of

hostile acts beginning in 2018 and continued through at least August of 2021 when Dr. Russo

began a sabbatical leave. A few examples of retaliatory acts are:

     a.  When Doe #4 first reported sexual harassment by d'Espalungue in October 2018, Russo was dismissive, telling her she should accept the harassment as "compliments."

     b.  Doe #4 was advised by a professor to file a Title IX complaint about d'Espalungue's harassment, but Doe #4 was afraid of retaliation.

     c.  Throughout 2018, 2019 and 2020, Russo verbally told graduate students to report all Title IX concerns to her.

     d.  On August 1, 2019, after Doe #4 was elected to a leadership position with the Department of French Studies Graduate Student Association (GSA), she emailed the Director of Graduate Studies about scheduling a GSA meeting during orientation week, but not wanting to conflict with his plans. He suggested a date and time to have a joint meeting. Russo later reprimanded Doe #4 and told her she had "no authority to schedule such meetings."

     e.  On August 9, 2019, Doe #4 and Doe #5 were called to a meeting with Russo purportedly to discuss GSA business. After a short discussion, Russo switched subjects and expressed her concerns about "the drama from last year." She stated she did not want any of that happening and that they heard any graduate students complain, they were to report them directly to Russo and not "go behind my back." Essentially, Russo asked Does #4 and #5 to spy on other graduate students.

     f.  At the same meeting on August 9, 2019, Russo told Doe #5 to leave so she could speak with Doe #4 alone about her prospectus. When Doe #5 was gone, Russo told Doe #4 she actually wanted to discuss her "conduct" and that Doe #4 had been a "know-it-all" in a meeting a week prior, when Doe #4 had been asked by the language coordinator to take the lead on explaining to Russo course syllabi changes they had made. Russo then stated she did not expect "any more drama" from Doe #4 that year. She began to explain that d'Espalungue was innocent, that the victim in that case had "changed her mind after the fact," and that d'Espalungue was planning a "countersuit for slander" against her. Russo then added that d'Espalungue "brought lots of money into the department" and his involvement "was important."

     g.  At no time during this conversation had Doe #4 brought up d'Espalungue, Title IX or his case.

     h.  Later the same day, August 9, 2019, Doe #4 completed work on a substitute teacher list that she had been asked to do during a previous meeting with Russo and the two language coordinators. Doe #4 emailed the draft to everyone. Russo

did not respond. The language coordinators made suggestions which Doe #4 implemented. Doe #4 sent the new version to everyone. Ten days later, Russo emailed back that she and one of the language coordinators "did not think it advisable for first year graduate students to teach upper-level classes." This had never come up in any of the meetings. Russo directed Doe #4 to redo all the forms.

i.   On August 22, 2019, Doe #4 attended a meeting of graduate assistant instructors on how to use the online meeting software. At the end of the meeting, as assistant to the language coordinator, Doe #4 said, "Hey y'all, if you have any questions later, please let me know." Russo quickly responded, loudly and publicly, "That was very disrespectful, [Doe #4]. Do not call me that." Doe #4 was very confused. Russo walked by a minute later and Doe #4 told her she didn't know what she heard, but Doe #4 was not trying to be disrespectful". Russo replied, "yes, you were. You know what you said." Doe #4 was very embarrassed. The stress from the week in conjunction with this embarrassing moment led Doe #4 to break down in the bathroom. A language coordinator later told Doe #4 that Russo insisted that Doe #4 had called her "Addie," which is her nickname, and she thought it was "highly inappropriate." Russo refused to change her opinion, even after being told that's not what was said.

j.   On September 1, 2019, Doe #4 received only part of her salary. Doe #4 made inquiries with the department administrative assistant. Three days later, Russo called Doe #4 into her office, angry that Doe #4 had contacted the assistant. Russo told her that the non-payment of salary was not an error – that Doe #4's work as assistant to the language coordinator was "on a volunteer basis" and she could list it on her CV. Doe #4 objected and said she had held the same position in the fall of 2018 and had been paid for it, and she had completed almost all work for the 2019 semester. Russo responded that all positions and discussions of roles should go through her (which had never been the case – Doe #4 received work through her direct supervisors, the language coordinators). Doe #4 explained she was not working voluntarily. Russo responded that Doe #4 was "overreacting" and that it was "not a big deal." Doe #4 said she disagreed. Russo replied, "we will have to agree to disagree" and asked Doe #4 to leave.

k.   Doe #4 reached out to the graduate advisor and others for advice. Ultimately, her salary was restored, but the hostility and abuse from Russo continued.

l.   After this point, Russo substantially stopped speaking with Doe #4, and blocked her from receiving information that she normally would have received.

m.   On September 12, 2019, Russo told another graduate student she didn't want to talk to Doe #4 in connection with DFSGSA matters (Doe #4 was president) and asked the other student to send an email to graduate students.

n.   On September 16, 2019, Russo asked another graduate student to ask Doe #4 for some dates.

o.   On September 24, 2019, Russo reprimanded Doe #4 by email for following instructions from one of the language coordinators to obtain an exam draft. "Please in future, contact me directly."

p.   Russo continued blocking Doe #4 from emails and treating her with hostility and disrespect, undermining all of her efforts to carry out her leadership and employment roles.

q.   On February 4, 2020, Russo called Doe #4 to tell her she was no longer working on the LSU in the French Alps program. Doe #4 learned from others that Russo had worked to get Doe #4 removed.

r.   On October 5, 2020, Russo sent a departmental email stating, "All instances covered by these regulations must be reported to the Department Chair, and I will

instruct you to contact the Dean's Office and the Title IX office if you have reason to lodge a complaint." This echoed what she had been telling grad students verbally for two years.

s. Doe #4 met with Title IX Coordinator Stewart on December 11, 2020, and with Investigator Jeffrey Scott on January 12, 2021. Doe #4 discovered from Scott that there was no record of her December 2018 Title IX meeting with Kim Davis.[93]

260. Doe #4 reported to Scott that her "biggest concern is that the remaining students feel safe and if they have a concern that they should feel comfortable reporting it without any ramifications from Russo."

261. Doe #5 abandoned her Ph.D. program at LSU after the spring semester of 2021, even though she had completed all her coursework. Like Doe #4, she could no longer endure the hostile educational environment and the retaliation and disrespect from Dr. Russo. As noted above, Doe #5 was one of the first students to file a Title IX report, submitted on November 1, 2018, describing the danger d'Espalungue posed to undergrads. Her report, like all others, was ignored. The student she was trying to protect, Doe #2, was raped less than three months later. Russo retaliated against Doe #5 in ways similar to her retaliation against Doe #4, and for the same reason: they had both filed Title IX complaints about d'Espalungue's harassment and endangerment of undergrads, and also complained about the reprisals and retaliation from Russo herself. On April 5, 2021, Doe #5 spoke to Madatic, the Deputy Title IX Coordinator for Employees, and reported that the ongoing retaliation and hostility in the French Department was making her consider not returning to LSU. Madatic responded they couldn't do anything about the situation other than giving Russo "additional training." Doe #5 could not bear to return to the hostile environment and has abandoned her dream to obtain a Ph.D. from LSU.

262. Does #1-5 were deprived of a normal educational environment and equal access to educational programs and benefits due to LSU's deliberate indifference and official policy of gender discrimination.

263. As the record shows, Doe #6 has been one of the strongest and most vocal advocates for gender equity and campus safety for female LSU students who were impacted by d'Espalungue's harassment and assaults, and by the reprisals Russo visited on anyone who complained. As a result, Doe #6 suffered retaliation and an ongoing hostile work environment. Doe #6 is the lowest-paid tenured professor in the LSU Department of French Studies, despite having more

---

[93] When Doe #4 received her Title IX records on April 19, 2021, she discovered Kim Davis' notes from the December 2018 meeting were included, but there was no case creation sheet for 2018.

seniority, a greater number and quality of published articles, and a doctoral degree from Harvard.

After reporting d'Espalungue's harassment and assisting grad students who had experienced

harassment by him, discussions of an equity raise came to a halt. Doe #6 received no salary

increase despite taking on additional work responsibilities which in the past have come with an

increased salary. In April 2020, when an endowed professorship came available which would

have increased Doe #6's salary, Russo informed Doe #6 by email and also in a personal

conversation, that Doe #6 was ineligible to apply because she already had a named professorship.

When the professorship came up in 2021, Doe #6 did not apply based upon Russo's instructions.

Instead, Russo successfully applied for it herself, despite the fact that she, too, has a named

professorship.


### CLAIMS FOR RELIEF

**COUNT I**
**Deliberate Indifference (Does #1-3)**
**(LSU Board of Supervisors)**
**Title IX 20 U.S.C. § 1681, *et seq*.**

264.    Plaintiffs adopt and incorporate by reference all previous paragraphs.

265.    LSU had actual knowledge as of October 10, 2018 that d'Espalungue posed a risk of

substantial harm to LSU female students based upon his two arrests, four days apart, for sexual

battery and forcible rape of a 21-year-old ULL student on September 30, 2018.

266.    LSU removed d'Espalungue from the classroom but allowed him to remain an employee

in a status of increased prestige and power within the LSU Department of French Studies as

Research Assistant to the Chair; retain his positions in LSU student government; host French

Table and French Cinema events with undergrads in attendance; and manage social media for the

Department and the LSU French Club.

267.    At least as of December 2018,[94] LSU officials with authority to rectify the situation had

received multiple and specific reports that d'Espalungue was harassing female LSU students,

that he was "aggressive," that because of fear of reprisals by Russo, some students were afraid to

come forward about harassment they experienced or witnessed; that d'Espalungue was in fact

leading French Table and French Cinema events despite lies by d'Espalungue and Russo denying

it; that he had regular contact with undergrads at these events; including his former students (Doe

---

[94] On information and belief, there were Title IX complaints about d'Espalungue earlier in 2018 and possibly in 2017.

#2 and #3); and that Doe #5 had witnessed d'Espalungue's behavior with Doe #2 (10 years younger than d'Espalungue) and found it alarming and inappropriate.

268.    LSU officials with authority to rectify the situation had actual knowledge of the risk, the harassment, and the vulnerability of young students and were deliberately indifferent. No meaningful action was taken, no investigation was opened, and no interim measures were adopted. LSU's actions and inactions were clearly unreasonable in light of the known circumstances.

269.    LSU's deliberate indifference caused Does #1-3 to undergo harassment, assault, and/or rape, and also made them liable or vulnerable to it. *Davis v. Monroe Cnty.Bd. of Educ.*, 526 U.S. 629, 645 (1999).

270.    As a direct result of LSU's deliberate indifference, d'Espalungue raped Doe #2 on January 31, 2019, raped Doe #1 on September 6, 2020, and sexually assaulted Doe #3 on multiple occasions, some of which fell within the definitions of *quid pro quo* harassment and/or the Clery Act.

271.    D'Espalungue was, at all times, an employee of LSU and Does #1-3 were undergrad students. LSU violated its obligation under Title IX to provide Does #1-3 with an educational environment free of sexual harassment. Appropriate officials received actual notice of harassment and were deliberately indifferent, which resulted in a hostile environment which denied Does #1-3 the ability to participate or benefit from LSU's programs. Does #1-3 are therefore entitled to damages as set forth below under "Damages.".[95]

272.    Even assuming the harassment and assaults involved student-on-student conduct and not employee-on-student (which is denied), they were severe, pervasive and objectively offensive and created a hostile educational environment which deprived Does #1-3 of access to the educational opportunities and benefits provided by the LSU.

273.    Considering the "constellation of surrounding circumstances, expectations, and relationships," including the "ages of the harasser and the victim and the number of individuals involved," the conduct in question meets the requisite level of severity.[96]

274.    LSU caused further damage and emotional distress to Does #2-#3 by its deliberate indifference to their Title IX reports filed November 16, 2020, with respect to d'Espalungue's

---

[95] *Gebser v. Lago Vista Independent School District,* 424 U.S. 274 (1998).
[96] *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 651 (1999) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998)).

sexual assaults, *quid pro quo* sexual harassment, Clery Act violations, and the grooming and endangerment of high school students. LSU's response – to close the files without investigation – was clearly unreasonable in light of the known circumstances and contributed to the hostile educational environment.

275.    In the alternative, plaintiffs allege that their assaults and harassment were a direct result of LSU's official policies and customs of gender discrimination as outlined above, and therefore the *Davis* framework of actual notice and deliberate indifference is inapplicable. *Doe v. Baylor Univ.*, 240 F.Supp.3d 656, 661 (W.D.Tex.2017) (*citing Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 ).[97]

276.    Plaintiffs' claims are timely. Here, Louisiana's one year statute of limitations for tort actions applies, subject to equitable tolling principles which include the discovery rule and fraudulent concealment, both of which apply here as to all plaintiffs. *King-White v. Humble Indep. Sch. Dist.*, 803 F.3d 754, 763-64 (5th Cir. 2015). Plaintiffs also rely on the continuing violation doctrine applicable to hostile educational and work environment claims within the Department of French Studies. *See Sewell v. Monroe City Sch. Bd.,* 974 F.3d 577 (5th Cir. 2020).

277.    Plaintiffs further allege that at least up to and including March 3, 2021, LSU had an official policy and practice of deliberate indifference to plaintiffs' right to an educational environment free of sexual harassment as outlined in the Husch Blackwell Report released on that date, evidenced by, among other things, deliberately choosing to under-staff and under-resource its Title IX Office, ignoring guidance from the U. S. Department of Education, ignoring the recommendations of its own Task Force in 2017, and allowing an organizational culture in which complaints of sexual assault and/or harassment were rarely investigated or taken seriously.

278.    Finally, plaintiffs rely upon Executive Order/Emergency Proclamation Number 170 JBE 2021 (dated September 6, 2021) issued in response to Hurricane Ida with respect to the rape of Doe #1.

279.    They did not know and could not have known until the Husch Blackwell Report was released on March 3, 2021, that 1) LSU had an official policy and practice of deliberate indifference to gender discrimination; 2) that there was a direct causal connection between the

---

[97] The Supreme Court also held in *Davis* that an institution normally is not liable under Title IX unless it has notice that its conduct could subject it to a damages claim but that "this limitation . . . is not a bar to liability where a funding recipient intentionally violates the statute." *Davis v. Monroe Cty. Bd. Educ.*, 526 U.S. 629, 642 (1999).

official policy and the harassment they experienced; or 3) that LSU had fraudulently concealed these facts from Doe #3 until release of the Report.

280.    Plaintiffs' claims are timely filed. Doe #1's rape was on September 6, 2020. The tolling period was suspended from August 26 to September 24, 2021, by Executive Order/Emergency Proclamation Number 170 JBE 2021 in response to Hurricane Ida, and Doe #1 has timely filed this complaint within the one-year period.

281.    Furthermore, the principle of equitable tolling applies due to LSU's fraudulent concealment of its own official policy and custom of gender discrimination as outlined above. Until the Husch Blackwell Report was released on March 3, 2021, plaintiffs did not know and had no reason to suspect that 1) LSU had an official policy and practice of deliberate indifference to sexual assaults, harassment and gender discrimination; 2) that there was a direct causal connection between the official policy and the sexual assaults and rapes they experienced; or 3) that LSU had fraudulently concealed these facts from the public and plaintiffs until release of the Report.

282.    As a direct, natural, and proximate result of LSU's deliberate indifference, official policies and fraudulent concealment, Does #1-3 have suffered actual damages as outlined in the "Damages" section, for which they are entitled to just compensation.

**COUNT II**
**Violation of Title IX**
**Hostile Environment (all Plaintiffs)**
**20 U.S.C. §§ 1681, *et seq.***
**(LSU Board of Supervisors)**

283.    Plaintiffs adopt and incorporate by reference all previous paragraphs.

284.    Title IX of the Education Amendments of 1972 provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681

285.    LSU is a recipient of federal funds within the meaning of 20 U.S.C. § 1681(a) and is therefore subject to Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688.

286.    All plaintiffs allege a Title IX violation against LSU for the creation, cultivation and perpetuation of a hostile environment due to gender discrimination.

287.    As outlined above, plaintiffs were subjected to "multiple and varied incidents of offensive conduct which had the cumulative effect" of creating a hostile educational and work

environment which deprived all plaintiffs' the ability to fully and equally participate in or benefit from LSU's programs, activities and/or jobs.[98]

288.    The harassment, discrimination, assaults, and other offensive conduct were severe, pervasive and objectively offensive, and constituted a continuous pattern of gender harassment which did not abate until approximately March 2021, as indicated by the multiple Title IX reports of harassment by d'Espalungue lodged continuously up to that point.

289.    The hostile educational and work environments deprived plaintiffs of the ability to fully and equally participate in or benefit from LSU's programs, activities and/or jobs.

290.    LSU had actual knowledge of the sex-based discrimination and was deliberately indifferent to it.

291.    LSU's failures and the resulting hostile environment were the result of official policy and custom as outlined above, all of which LSU fraudulently and intentionally concealed until release of the Husch Blackwell Report on March 3, 2021.

292.    LSU repeatedly failed to initiate or conduct reasonable investigations or offer appropriate interim measures to remedy the ongoing hostile environment.

293.    As Doe #6 told Madatic on January 17, 2019, when relaying yet another report about d'Espalungue endangering young women and harassing grad students, women "just want to be taken seriously."

294.    Plaintiffs' hostile environment claim is timely. They did not know and could not have known until the Husch Blackwell Report was released on March 3, 2021 that 1) LSU had an official policy and practice of deliberate indifference to gender discrimination; 2) that there was a direct causal connection between the official policy and the hostile environment they experienced; or 3) that LSU had fraudulently concealed these facts from the public and plaintiffs until release of the Report.

295.    As a direct, natural, and proximate result of LSU's deliberate indifference, official policies and fraudulent concealment, Does #1-3 have suffered actual damages as outlined in the "Damages" section, for which they are entitled to just compensation.

---

[98] *See Rabidue v. Osceola Refining Co.*, 805 F.2d 611, 620 (6th Cir. 1986); *Bustamento v. Tucker*, 607 So.2d 532, 538-539 (La. 1992).

**COUNT III**
**Violation of Title IX**
*Quid Pro Quo* **and Clery Act Violations (Doe #3)**
**(LSU Board of Supervisors)**
**Title IX 20 U.S.C. § 1681,** *et seq.*

296.    Plaintiffs adopt and incorporate by reference all previous paragraphs.

297.    Title IX of the Education Amendments of 1972 provides in pertinent part: "[N]o person .

. . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be

subjected to discrimination under any education program or activity receiving Federal financial

assistance." 20 U.S.C. 1681(a).

298.    At all times, d'Espalungue was an employee of LSU. He was employed as a Graduate

Assistant to the Language Coordinator in 2017-2018, Teaching Assistant at the beginning of the

fall semester 2018, and as Research Assistant to Dr. Russo from on or about October 4, 2018

until his suspension from LSU on November 20, 2020.

299.    In the spring of 2019, with the help of Dr. Russo, d'Espalungue launched AJFS ("the

Journal") as a program or activity of LSU, the LSU College of Humanities and Social Studies,

and the LSU Department of French Studies.

300.    In March of 2019, d'Espalungue recruited Doe #3, a freshman who was his former

student, to work on the Journal. Doe #3 devoted significant time, effort, and attention to working

on the Journal.

301.    At various times beginning in 2019, d'Espalungue would explicitly or implicitly made it

a term or condition of Doe#3's continued position with the Journal that she accept unwelcome

sexual advances, requests for sexual favors and other verbal, visual, and physical conduct of a

sexual nature, which is *quid pro quo* sexual harassment.[99]

302.    Doe #3 was repeatedly kicked off the journal, ridiculed, shamed, barraged with offensive

text messages, threatened, and verbally abused when she refused to meet d'Espalungue alone or

otherwise protect herself from the unwelcome conduct.

303.    In other instances, d'Espalungue's unwelcome touching and groping met the definition of

sexual assault under the Clery Act.[100]

---

[99] *See* Title IX regulations, 34 C.F.R. §106.30(a)(1) which includes within the definition of sexual harassment conduct in which "an employee of the recipient conditioning the provision of an aid, benefit, or service of the recipient on an individual's participation in unwelcome sexual conduct."

[100] Under the Department of Education regulations, 34 C.F.R. 106.30 (a)(3), sexual harassment includes "sexual assault" as defined in the Clery Act, 20 U.S.C. 1092(f)(6)(A)(v). The latter provision in turn adopts by reference the FBI the uniform crime reporting system, including its definition of Forcible Fondling ("The touching of the private body parts of another person for the purpose of sexual gratification without the consent of the victim").

304.    *Quid pro quo* harassment and Clery Act assault constitute *per se* violations of Title IX, regardless of severity or pervasiveness.[101]

305.    The Title IX harassment in question was directly caused by LSU's official policies and customs of gender discrimination, and therefore the *Davis* framework of actual notice and deliberate indifference is inapplicable. *Doe v. Baylor Univ.*, 240 F.Supp.3d 656, 661 (W.D.Tex.2017) (*citing Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 ).[102]

306.    Doe #3's claim is timely. She did not know and could not have known until the Husch Blackwell Report was released on March 3, 2021 that 1) LSU had an official policy and practice of deliberate indifference to gender discrimination; 2) that there was a direct causal connection between the official policy and the *quid pro quo* and Clery Act harassment she experienced; or 3) that LSU had fraudulently concealed these facts from Doe #3 until release of the Report.

307.    As a direct, natural, and proximate result of LSU's deliberate indifference, official policies and fraudulent concealment, Doe #1 has suffered actual damages as outlined in the "Damages" section, for which she is entitled to just compensation.

### COUNT IV
### Violation of Title IX
### Heightened Risk (Does #1-5)
### 20 U.S.C. §§ 1681, *et seq.*
### (LSU Board of Supervisors)

308.    Plaintiffs adopt and incorporate by reference all previous paragraphs.

309.    LSU's official policies, adopted by LSU's top leadership, resulted in a widespread pattern of discriminatory responses to female students which created a heightened risk of sexual assault and harassment for Does #1-5 and other female LSU students.

310.    As a direct result, d'Espalungue raped Does #1 and #2, sexually assaulted Doe #3, and harassed Does #4 and #5.

---

[101] Under Department of Education regulations, 34 C.F.R. 106.30(a) there are three categories of sexual harassment. Two of them address serious violations that they are considered harassment *per se* and do not require a showing that the conduct was "severe" or "pervasive." The first category is *quid pro quo* harassment in which a teacher or employee conditions "the provision of an aid, benefit, or service of the recipient on an individual's participation in unwelcome sexual conduct." The second category includes certain conduct included in the Clery Act and/or the Violence Against Women Act. Here, d'Espalungue committed both a *quid pro quo* violation and a Clery Act "sexual assault" violation because it met the FBI's definition of Forcible Fondling ("The touching of the private body parts of another person for the purpose of sexual gratification without the consent of the victim").

[102] The Supreme Court also held in *Davis* that an institution normally is not liable under Title IX unless it has notice that its conduct could subject it to a damages claim but that "this limitation . . . is not a bar to liability where a funding recipient intentionally violates the statute." *Davis v. Monroe Cty. Bd. Educ.*, 526 U.S. 629, 642 (1999).

311.    The Husch Blackwell report documents innumerable policy choices (both action and

inaction) by which LSU's leadership chose to treat its female student body as second-class

citizens. The paltry $329,000 request for additional staff and training submitted by Title IX

Coordinator Stewart in 2016 would have been a start to remedying what apparently was "Title

IX Theater" rather than a system which intended to comply with Title IX. Instead, LSU decided

it was too much to invest to protect women and other victims of gender harassment and sexual

assault.

312.    LSU knew of and permitted a campus rife with harassment and assault. Its Title IX

system was designed to fail through intentional policy choices of its leadership. The Title IX

office was critically under-staffed, under-resourced and under-trained. Conflicts of interest were

built into the system, and even a task force could not determine the organizational chart and

reporting structure. LSU mishandled investigations, adjudications, record-keeping. The long

history of failing victims created a culture which discouraged reporting, even as victims had no

idea why the system was failing.

313.    It wasn't until publication of the Husch Blackwell Report on March 3, 2021 that plaintiffs

knew or had reason to suspect that they had a heightened risk claim based upon official LSU

policies, and that there was a causal relationship between the harassment and assaults they

experienced and LSU's policies.

314.    The Report documents the many ways LSU leadership intentionally and deliberately

adopted policies which violated the spirit and letter of Title IX. As outlined above, actual notice

and deliberate indifference need not be shown where a funding recipient intentionally violates

the statute. *Davis v. Monroe Cty. Bd. Educ.*, 526 U.S. 629, 642 (1999). *See also Doe v. Baylor*

*Univ.*, 240 F.Supp.3d 656, 661 (W.D.Tex.2017)

315.    Plaintiffs' claim is timely. As noted above, LSU's intentional fraudulent concealment

tolls the statute of limitations "until a party learns of facts, conditions, or circumstances which

would cause a reasonably prudent person to make inquiry, which pursued, would lead to

discovery of the concealed cause of action." *King-White v. Humble Indep. Sch. Dist.* , 803 F.3d

754, 764. *See also Lozano v. Baylor Univ.*, 408 F.Supp.3d 861, 900 (W.D.Tex. 2019).

316.    Plaintiffs did not know and could not have known until the Report  was released on

March 3, 2021 that 1) LSU had an official policy and practice of deliberate indifference to

gender discrimination; 2) that there was a direct causal connection between the official policy

and the heightened risk claim; or 3) that LSU had fraudulently concealed these facts from Doe #3 until release of the Report.

317.    As a direct, natural, and proximate result of LSU's official policy of discrimination, deliberate indifference, and fraudulent concealment, plaintiffs have suffered actual damages as outlined in the "Damages" section, for which they are entitled to just compensation.

## COUNT V

**Violation of Title IX**
**Retaliation (Does #4-6)**
**20 U.S.C. §§ 1681, *et seq.***
**(LSU Board of Supervisors)**

318.    Title IX and its regulations prohibit retaliation against any person who complains about what they reasonably believe to be a Title IX violation, advocates on behalf of Title IX rights and enforcement, or cooperates in any investigation of a Title IX violation.

319.    Does #4-6 engaged in protected activity by reporting incidents of sex-based harassment and discrimination they experienced, witnessed, or became aware of by d'Espalungue, an LSU employee and student.

320.    Plaintiffs also reported that d'Espalungue, who had been removed from the classroom, purportedly to protect female students from a risk of substantial harm after his arrest for sexual battery and forcible rape, was finding other ways to interact with young, vulnerable and naïve students, and that his interactions were sexualized and inappropriate.

321.    As outlined above, Does #4-6 filed multiple reports of harassment and endangerment with the Title IX office and other LSU officials with authority to rectify the situation, which are a protected activity.

322.    Plaintiffs were thereafter subjected to an ongoing and cumulative series of retaliatory and hostile acts which were a direct and proximate result of their Title IX reporting as evidenced by the conversations, actions and events detailed above.

323.    Plaintiffs also reported the retaliation they experienced to LSU officials with authority to rectify it, and LSU failed to investigate or take any remedial action. LSU took the position that nothing could be done but to provide Russo with "additional training."[103]

---

[103] See ¶ 268.

324.    LSU officials with authority to rectify the situation received actual notice that Dr. Russo

had created a hostile work environment by retaliating against students and faculty who

complained about sexual harassment by d'Espalungue, or the fact that he was in contact with

undergrads via multiple leadership roles in the French Department.

325.    LSU was deliberately indifferent to the retaliation and hostile environment that resulted.

326.    Plaintiffs' claims are timely. The retaliation and hostile environment continued for

Doe #4, even after she dropped to part-time at the end of the fall semester of 2019 re-located

outside the U. S. She is still a grad student seeking her Ph.D. in the LSU Department of French

Studies, and the hostile environment has never abated.

327.    For Doe #5, the retaliatory pattern continued until she abandoned her educational

program altogether at the end of the spring semester of 2021 due to the hostile environment. Doe

#6 continues to suffer the effects of retaliation as detailed above. Plaintiffs' claims are therefore

timely.

328.    As a direct, natural, and proximate result of the retaliation and LSU's failure to

investigate or address it along with the hostile environment which resulted, plaintiffs have

suffered actual damages as outlined in the "Damages" section, for which they are entitled to just

compensation

## COUNT VI
### Denial of Equal Protection (All plaintiffs)
### 42 U.S.C. § 1983 and Fourteenth Amendment
### (All Defendants)

329.    Plaintiffs adopt and incorporate by reference all previous paragraphs.

330.    The Equal Protection clause of the Fourteenth Amendment to the United States

Constitution protects individuals from unlawful sex discrimination, including sexual harassment,

stating in relevant part, "No State shall…deny to any person within its jurisdiction the equal

protection of the laws."[104]

331.    Title 42 U.S.C. §1983 states in relevant part, "Every person who, under color of any

statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of

Columbia, subjects, or causes to be subjected, any citizen of the United States or other person

---

[104] "All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside.  No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." Constitution of the United States, Amendment XIV, Section 1.

within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured

by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity,

or other proper proceeding for redress…"

332.   Plaintiffs allege 42 U.S.C. §1983 claims against LSU and all individual defendants in

their personal capacities for discrimination on the basis of sex which denied plaintiffs equal

protection under the law in violation of the Fourteenth Amendment.

333.   All defendants are state actors who were acting under color of state law at all relevant

times.

334.   Plaintiffs' federal civil rights are also secured by federal statute. Title IX of the Education

Amendments of 1972 provides in pertinent part: "[N]o person . . . shall, on the basis of sex, be

excluded from participation in, be denied the benefits of, or be subjected to discrimination under

any education program or activity receiving Federal financial assistance."

335.   Title IX was intended to benefit students and employees such as plaintiffs.

336.   Title IX provides plaintiffs clear civil rights, which are not amorphous or vague, to be

free from known sex discrimination or retaliation for reporting sex discrimination in any

educational program. Title IX imposes a binding mandatory obligation on federal funding

recipients such as LSU, prohibiting it from discriminating against students or employees on the

basis of sex.

337.   Title IX prohibits retaliation against students or employees who report violations of Title

IX.

338.   As detailed throughout this Complaint, sexual harassment, sexual assault, an increased

risk of sexual assault, sexual misconduct, retaliation, and a hostile educational and work

environment discriminated against plaintiffs based on sex by depriving them of access to an

equal education under the laws of the United States and equal protection under the United States

Constitution.  Discrimination based on sex is presumptively unconstitutional.

339.   Sexual harassment is a form of discriminatory treatment and applies in any situation

where there is discrimination "because of" sex, whether it be between members of the same or

opposite sexes.[105]

---

[105] *Cherry v. Shaw Coastal, Inc.,* 668 F.3d. 182 (5th Cir. 2012) citing *Oncale v. Sundowner Offshore Servs.,* 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

340.    Defendants' acts, including but not limited to, deliberate indifference to reports of sexual

harassment and endangerment, mishandling of reports by Does #2-6; mishandling of the

adjudication of Doe #1's case; failures to investigate plaintiffs' credible allegations; and failures

to address the retaliation against Does #4-6, reflect the school's widespread practice, custom, and

institutional policy of gender discrimination.

341.    The result was an increasingly dangerous campus environment and a heightened risk of

danger for Does #1-5 and other female students; a hostile education and work environment

which deprived all plaintiffs of an equal college education and work experience, equal

educational opportunities, equal future earning capabilities, and equal protections under the law.

This is discrimination based on sex under the U.S. Constitution and Title IX.[106]

342.    As evidenced by the Husch Blackwell Report, LSU had an entrenched custom and/or

practice of mishandling and/or ignoring complaints and reports of sexual misconduct.  The

improper handling of Title IX complaints was so commonplace and widespread, it permeated

multiple university departments and became an institutional policy of discrimination.[107]

343.    Despite years of warnings and actual knowledge of understaffed and poorly trained

offices charged with handling sexual misconduct claims, including sexual assault, LSU's staff

and highest officers, including defendants, consciously maintained the system, creating an

institutional policy, practice and/or custom of intentional discrimination based on sex which

routinely protected abusers and adversely affected plaintiffs.[108]

344.    LSU's failure to properly staff and train its Title IX office created a policy or custom of

inadequately handling and discouraging reports of sexual misconduct and constituted an official

policy of discrimination based on sex that created a heightened risk of harm to Does #1-5.

---

[106] The U. S. Supreme Court, in *Fitzgerald v. Barnstable Sch. Comm.*, 555 U. S. 246 255-58 (2009), stated, "In light of the divergent coverage of Title IX and the Equal Protection Clause, as well as the absence of a comprehensive remedial scheme comparable to those at issue in *Sea Clammers, Smith*, and *Rancho Palos Verdes*, we conclude that Title IX was not meant to be an exclusive mechanism for addressing gender discrimination in schools, or a substitute for § 1983 suits as a means of enforcing constitutional rights. Accordingly, we hold that § 1983 suits based on the Equal Protection Clause remain available to plaintiffs alleging unconstitutional gender discrimination in schools."
[107] "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011)

[108] "Under the third category—liability for official policy arising from a municipality's practices—a plaintiff must show two things. First, "[a] persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Id.* (citing *Webster v. City of Hous.*, 735 F.2d 838, 841 (5th Cir. 1984)). Second, a plaintiff must show actual or constructive knowledge of that custom by the municipality or the official who had policymaking authority. *Id.* (cleaned up)." *Lozano v. Baylor*, 408 F.Supp.3d. 861 (W.D. TX 2019)

345.     Defendants had actual knowledge of d'Espalungue's rape arrest and his risk of substantial

harm to LSU's female students (including Does #1-5), his continued and increased contact with

female students, his elevated status at the hands of Dr. Russo, and had received credible detailed

reports of d'Espalungue's continuing leadership in the LSU French Department and Russo's

retaliation, yet they took no action to investigate the potentially dangerous situation and took no

steps to mitigate the danger to plaintiffs, nor the hostile, retaliatory environment detailed herein.

Defendants' intentional actions and inaction discriminated against Does #1-5 on the basis of sex,

violating the U.S. Constitution and Title IX.

346.     At all times relevant hereto, LSU was a policymaker and administrator and defendants

were authorities in positions of leadership having duties to train who failed to properly or

sufficiently train administrators and staff about 1) school policies concerning sex discrimination,

sexual harassment and retaliation against students and employees; 2) sex discrimination and

sexual harassment against students and employees; 2) Title IX and/or employee-against-student

and student-against-student sexual misconduct; and 3) identifying, investigating, reporting, and

remedying the effects of sexual harassment and retaliation by employees such as Dr. Adelaide

Russo and employee/students such as Edouard d'Espalungue against plaintiffs.

347.     LSU intentionally failed to train its administrators, staff, and students despite the plainly

obvious need for training on, among other things, employee-against-student and student-against-

student sexual misconduct and identifying, investigating, reporting, stopping, and remediating

the effects of sexual harassment.

348.     LSU intentionally failed to train its administrators, staff, and students despite the plainly

obvious need for training on, among other things, the prohibition, illegality, and impropriety of

retaliating against students like plaintiffs who reported violations of Title IX and sexual

misconduct which is vital to enforcement of Title IX.

349.     The U.S. Supreme Court, the U.S. Department of Education, case law and other

authorities made clear and gave notice to LSU that school employees will confront student

sexual harassment and abuse with regularity, given the high predictability, recurrence and

prevalence of sexual assault and abuse in schools.[109] Thus, it was foreseen and inevitable that

LSU's administrators and employees would encounter recurrent situations involving sexual

---

[109] It is an unfortunate truth that one could "anticipate that the very operation of a school would be accompanied by sexual harassment." *Simpson v. Univ.*, 500 F.3d 1170, 1177 (10th Cir. 2007).

abuse that implicated students' Constitutional and federal rights, and it did, in fact, encounter those recurring situations.

350.    LSU intentionally failed to adequately train its administrators, staff, and students, failed to properly staff offices, and failed to prohibit or discourage foreseen conduct and retaliation, despite the clearly established and well-known dangers of sexual harassment, assault, battery, and violence faced by female students such as plaintiffs, and thereby was deliberately indifferent to the protected constitutional and federally protected rights of plaintiffs.

351.    Plaintiffs allege that no reasonable person or entity in the position of any Defendant would have believed that doing nothing about credible complaints of sexual assault and harassment by d'Espalungue, openly defending and protecting him, or punishing individuals who complained about his conduct was lawful in light of the clearly established principle that deliberate indifference to sexual harassment is an equal protection violation under the Constitution.

352.    LSU's intentional failures—including, but not limited to, failure to train its administrators, staff, and students; failure to properly staff the Title IX office; failure to investigate credible claims of sexual misconduct by plaintiffs; failure to ensure plaintiffs were free from danger and retaliation-- effectively denied plaintiffs' clearly established federal rights under Title IX  and Constitutional rights under the Fourteenth Amendment.

353.    LSU's intentional failure to investigate the credible complaints of plaintiffs, particularly in light of d'Espalungue's rape arrest, and failure to protect plaintiffs from further foreseeable harm violated plaintiffs' Constitutional rights, subjecting Does #1-5 to discrimination on the basis of sex in violation of the Fourteenth Amendment.

354.    Does #1-5 further allege that the individual Defendants: Russo, Blanchard, Stewart, Normand and Madatic actually knew of and acquiesced in the sex based discriminatory conduct which caused their injuries, damages and losses; and that defendants' deliberate indifference and lack of response violated clearly established statutory and/or constitutional rights of which a reasonable person would have known.

355.    Further, LSU's intentional failure to train administrators, staff, and students was deliberate, reckless, and in callous indifference to the obvious federally protected rights of Does #1-5 and directly resulted in violations of their constitutionally protected rights under the Fourteenth Amendment.

356.    Defendants' acts of discrimination were not related to and served no legitimate government interest.

## COUNT VII
### Denial of Procedural Due Process (State Created Danger) (Does #2-3)
### 42 U.S.C. §1983 and Fourteenth Amendment
### (All Defendants)

357.    Plaintiffs adopt and incorporate by reference all previous paragraphs.

358.    The Fourteenth Amendment to the United States Constitution, enforceable through 42 U.S.C. §1983 protects bodily integrity as a substantive due process right. [110]

359.    Individuals have the right to be free from bodily harm caused by the state. [111]

360.    Defendants are liable to Does # 2 and #3 for a violation of their substantive due process rights to bodily integrity as defendants' actions and inaction created and increased the danger to Does #2 and #3 whose health and safety defendants then treated with deliberate indifference.

361.    Does #2 and #3 were victims who were clearly identified and known to the defendants prior to suffering sexual harassment and/or assault by d'Espalungue. [112]

362.    At all relevant times, defendants were state actors acting under color of state law.

363.    On September 30, 2018, d'Espalungue was arrested and charged with sexual battery of a 21-year-old ULL student while at a Catholic retreat in Rapides Parish. Four days later, detectives re-arrested and charged him with forcible rape after a deeper investigation. Defendants Madatic, Hicks, Blanchard, and Russo were immediately informed of the arrest and charges.

364.    At the time he was charged with forcible rape, d'Espalungue was teaching French at LSU to undergraduate students, including freshmen Does #2 and #3.

---

[110] "Following *DeShaney*, '[t]here is a recognized substantive due process right for individuals to be free from bodily harm caused by the state, but as a general rule, there is no constitutional duty that requires state officials to protect persons from private harms." *Kovacic v. Villarreal*, 628 F.3d 209, 213 (5th Cir. 2010) (citing *DeShaney*, 489 U.S. at 189, 109 S.Ct. 998). "This general rule is not absolute: in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." *McClendon v. City of Columbia*, 305 F.3d 314, 324 (5th Cir. 2002) (citing *DeShaney*, 489 U.S. at 198, 109 S.Ct. 998)." *Lozano v. Baylor University*, 408 F.Supp.3d. 861 (W.D. TX 2019). "But the Fifth Circuit has recognized that certain minimum rights of 'bodily integrity' or 'personal security' are substantive due process rights." *Id.*

[111] "We have stated that '[t]he right to be free of state-occasioned damage to a person's bodily integrity is protected by the fourteenth amendment guarantee of due process.'" *Jefferson v. Ysleta Independent School District*, 817 F.2d 303 (5th Cir. 1982), *Doe v. Taylor Independent School District*, 15 F.3d. 443, 450 (5th Cir. 1994)

[112] State created danger requires the school to "be aware of an immediate danger to a specific and identifiable student." *Doe ex. rel. Magee v. Covington*, 675 F.3d. 849 (5th Cir. 2012)

365.    Following his arrest, defendants removed d'Espalungue from classroom teaching, purportedly because LSU recognized the risk of substantial harm d'Espalungue posed to young female students, including Does #2 and #3.

366.    Dr. Russo immediately negated this act by taking affirmative steps to elevate and protect d'Espalungue both immediately after his arrest in 2018 and continuing through (at least) his suspension in 2020 and possibly longer.  Those acts include, but are not limited to:  maintaining him as the grader for his undergraduate class which included Does #2 and #3; hiring him as her personal assistant; charging him with videotaping his fellow graduate assistant instructors; allowing him to coordinate and lead French department social events including the French Table and French movie night; charging him with the administration of the Department's social media sites; allowing him to register as the French Club president and act as administrator of its social media;  allowing him to maintain his position as President of the French Studies Graduate Student Association; including him in numerous French department social events with undergraduate students; elevating him to positions of prestige in French Department events; publicly maintaining his innocence and overtly silencing and retaliating against female students who were being harassed and/or recognized and reported that he was a danger to undergrads; denying he was "leading anything" or was doing "any sort of service" which would bring him in contact with other students when she knew this was untruthful; instructing students to report potential Title IX complaints directly to Russo; ignoring reports of sexual misconduct by d'Espalungue; and aiding d'Espalungue in the formation, funding, and marketing of the American Journal for French Studies in connection with the LSU French Department.

367.    Russo's actions and intentional inaction as to the concerns of complainants created a significant danger and/or heightened danger to Does #2 and #3 as she emboldened d'Espalungue and allowed him elevated prestige and a position of broader access to and authority over Does #2 and #3.

368.    Russo's actions, inaction, and retaliation, which created a danger and/or heightened danger for Does #2 and #3, were reported to the remaining defendants beginning in October 2018 and continuing through at least November 2020.

369.    Specifically, in November 2018, written statements were submitted to the LSU Title IX Office, one directly implicating d'Espalungue in the danger to Doe #2, a vulnerable undergraduate student.  A "concerned female graduate student" reported her concern for the

73

safety of Doe #2 after witnessing d'Espalungue's alarming and inappropriate interactions with Doe #2 at a French Table event. This concern was also verbally discussed with Kimberly Davis of the Title IX office in December 2018.

370.   Does #5 and #6 put the defendants on direct notice of danger and a threat of direct harm to Doe #2 in November and again in December 2018, and possibly at other times.

371.   Also in November 2018, while defendants were intentionally failing to investigate the numerous claims of sexual misconduct and safety concerns in connection with d'Espalungue and while Dr. Russo was protecting and elevating his status, d'Espalungue emailed unsuspecting Does #2 and #3 to join him for a French movie night which he was coordinating. His email was signed with notations of his status as Vice President of the French Studies Graduate Association and as senator of the LSU Student Government Association, which defendants allowed him to maintain.

372.   Reports of an escalating situation where d'Espalungue was being elevated and acting in leadership roles within the department and more females were reporting sexual misconduct were forwarded to defendants throughout November and December 2018 and into January 2019.

373.   On January 19, 2019, Defendant Madatic made handwritten notes referencing d'Espalungue's continued leadership roles, inappropriate behavior, his continued and escalating contact with the undergraduate students, and the fact that he was alone with the undergraduate students at the French Table. She noted concerns about the chair, the lack of investigation by Title IX, and d'Espalungue's leadership in student government. Defendant Madatic then contacted defendant Blanchard.

374.   The only action taken by the defendants after this exchange, however, was for defendant Hicks to simply ask Dr. Russo about the allegations, which she denied. Defendants investigated no further.

375.   Despite d'Espalungue's forcible rape charges, the direct notice of danger to Doe #2, the direct notice of safety concerns for the undergraduate students including Does #2 and #3, and numerous reports of an escalating situation of sexual misconduct and retaliation connected with d'Espalungue and the LSU French Department reported to defendants throughout the fall and winter of 2018 and into 2019, defendants took no action whatsoever to investigate the claims or mitigate the danger to Does #2 and #3.

376.    During the same time and with the same knowledge. Dr. Russo took affirmative steps to continue raising d'Espalungue's prestige and power in the department, offering d'Espalungue broader access and a position of more authority over Does #2 and #3, and creating a heightened danger for these identified victims.

377.    The defendants knew of the danger created and/or heightened by Dr. Russo and by their own intentional inaction and indifference and knew Does #2 and #3 were specific potential victims yet took no action to investigate or mitigate the danger to Does #2 and #3.

378.    The actions and inaction of the defendants amount to deliberate indifference as to the health and safety of Doe #2 and Doe #3.

379.    D'Espalungue raped Doe #2 on January 31, 2019. He then manipulated this vulnerable, young student into a continued sexual relationship with him, an authority figure many years her senior.

380.    In March 2019, Dr. Russo aided d'Espalungue in creating the American Journal of French Studies (AJFS) in connection with the LSU French Department and funded by LSU. Notably, LSU and LSU French Studies are still listed as a "Institutional Partners".

381.    D'Espalungue, as Executive Director of the AJFS, President of the French Club, and personal assistant to the Chair of the French Department, recruited young students including Does #2 and #3 to work with him on this new, prestigious, widely publicized project.

382.    D'Espalungue promoted his new AJFS connections with esteemed organizations and individuals like the Lieutenant Governor of Louisiana to his "team", emphasizing the benefits and importance of working with him on the journal.

383.    D'Espalungue then used his new status to subject Doe #3 to multiple instances of inappropriate sexual contact both physically and verbally and to subject her to *quid pro quo* sexual harassment by threatening her position with the journal in exchange for sexual demands.

384.    Throughout the entire relevant time period. the defendants knew of the danger they had created and/or heightened in the d'Espalungue situation and showed complete indifference to the dangers faced by Doe #2 and #3. [113]

---

[113] In *Scanlan v. Texas A&M Univ.*, 343 F.3d. 533 (5th Cir. 2003) the court explained that the state-created danger theory requires "a plaintiff [to] show [1] the defendants used their authority to create a dangerous environment for the plaintiff and [2] that the defendants acted with deliberate indifference to the plight of the plaintiff." *Scanlan*, 343 F.3d at 537–38.

385.    LSU's practices, customs, and/or policies placed Does #2 and #3 in a position of danger they would not have otherwise faced

386.    The intentional actions and/or inaction of defendants placed Does #2 and #3 in a position of danger they would not have otherwise faced.[114]

387.    The sexual harassment and violence suffered by known victims Does #2 and #3 in violation of their constitutional rights to bodily integrity and to be free from state caused bodily harm was foreseeable and a direct result of the dangerous situation that was created, heightened, and deliberately met with indifference by defendants.

**COUNT VIII**
**First Amendment – Deterrence and Retaliation (All plaintiffs)**
**42 U.S.C. § 1983, First Amendment**
**(All Defendants)**

388.    Plaintiffs adopt and incorporate by reference all previous paragraphs.

389.    Plaintiffs, as students and employees of LSU, allege a violation of their rights under the First Amendment to the United States Constitution by LSU and the individual defendants in their personal capacities.

390.    Title 42 U.S.C. §1983 states in relevant part, "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…"

391.    Ratified in 1791, the First Amendment to the United States Constitution provides in relevant part, "Congress shall make no law … abridging the freedom of speech."

392.    Ratified in 1868, the Fourteenth Amendment makes the First Amendment's Free Speech Clause applicable against the States and state authorized actors: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law …."

393.    State authorized actors include public universities and their employees.

---

[114] To establish deliberate indifference for purposes of state-created danger, the plaintiff must show that "[t]he environment created by the state actors must be dangerous; they must know it is dangerous; and … they must have used their authority to create an opportunity that would not otherwise have existed for the third party's crime to occur." *Piotrowski v. City of Houston*, 237 F.3d 567, 585 (5th Cir.2001); also see *McClendon*, 305 F.3d at 326 n. 8 ("To act with deliberate indifference, a state actor must know of and disregard an excessive risk to the victim's health or safety.") (Internal quotation marks and alterations omitted).

394.    All defendants are state actors and acted under color of state law at all relevant times.

395.    Plaintiffs had, at all relevant times, a clearly established right to freedom of speech pursuant to the First Amendment, a fundamental American legal principle, which any reasonable public official would have known.

396.    Sexual misconduct allegations associated with public entities, including LSU as a public university, are a matter of public concern as they engage a clear interest to the community which outweighs any basis for negating the speech.[115] Such speech is protected by the First Amendment.

397.    The ability of LSU to operate normally were not disrupted by plaintiffs' exercise of their First Amendment rights.

398.    Plaintiffs engaged in constitutionally protected speech when they notified LSU employees, including the individual defendants, of instances of sexual harassment, sexual assault, sexual inappropriateness, discomfort, safety concerns, retaliation, and Title IX violations in connection with the behavior of d'Espalungue and the LSU French Department.

399.    Plaintiffs suffered retaliation in the form of a hostile work and educational environment as a direct result of exercising their First Amendment rights, in violation of their constitutional rights and statutory rights under Title IX.

400.    As outlined in previous paragraphs, defendants subjected plaintiffs to acts which included, but are not limited to, humiliation, dismissal, aggression, disregard, loss of opportunity, and public ridicule for reporting the relevant sexual misconduct, a protected speech.

401.    Employee plaintiffs further suffered retaliation by defendants in the form of financial retaliation and deprivation of professional opportunities.

402.    The actions of defendants were glaring attempts to regulate plaintiffs' free speech and would chill or discourage any ordinary person from raising concerns about further sexual misconduct and defendants' shockingly inadequate response.

403.    Despite the known danger to female LSU students, Dr. Russo elevated d'Espalungue's status within the LSU French Department after his rape arrest and after receiving credible allegations of his sexual misconduct at LSU.

---

[115] To succeed under a 42 U.S.C. §1983 First Amendment claim, university employees such as the LSU employee plaintiffs, must show: (1) They were adversely affected for speech that is a matter of public concern and (2) their interest in the speech outweighed the university's interest in an efficient, non-disruptive workplace. *Connick v. Myers*, 461 US 138, 147-50 (1983); *Pickering v. Board of Education*, 391 US 563, 568 (1968)

404.    Dr. Russo blatantly protected d'Espalungue and broadened his access to unsuspecting young, female students.

405.    Dr. Russo took aggressive measures against those female LSU students who exercised their First Amendment rights by reporting the sexual misconduct allegations against d'Espalungue.

406.    Dr. Russo attempted to circumvent the Title IX process, further violating plaintiffs' free speech rights and regulating the content of their speech, by disseminating an email wherein individuals were advised to report any Title IX issues directly to her, rather than the Title IX office, for her to determine their credibility.

407.    Dr. Russo's actions and the deliberate inaction of the remaining defendants would chill or discourage any ordinary person from reporting further sexual misconduct.

408.    Despite credible reports clearly outlining both constitutional and Title IX violations, defendants failed to investigate or report the allegations of sexual misconduct, harassment and assault suffered by female LSU students at the hands of d'Espalungue even knowing he had been arrested and was currently charged with the forcible rape of a UL student, and the improper, hostile, and retaliatory actions of Dr. Russo.

409.    Defendants adversely affected the educational and professional careers of plaintiffs as a direct response to plaintiffs' exercise of constitutionally protected free speech.

410.    As evidenced by the Husch Blackwell Report, LSU as policymaker and the remaining defendants as authorities and leaders had an entrenched custom and/or practice of mishandling and/or ignoring complaints and reports of sexual misconduct.  The improper handling of Title IX complaints was so commonplace and widespread, it permeated multiple university departments and became policy.[116]

411.    Despite years of warnings and actual knowledge of understaffed and poorly trained offices to handle sexual misconduct claims, LSU as policymaker and remaining defendants as authorities and leaders consciously maintained the system, creating a policy, practice and/or custom which routinely protected abusers and adversely affected victims such as plaintiffs. [117]

---

[116] "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011)

[117] *Ibid.*, p. 101, fn. 109.

412.    LSU's customs, practices, and/or policies allowed d'Espalungue to continue abusing female victims and allowed Dr. Russo unencumbered leeway to protect and promote him which deprived plaintiffs of their constitutional rights and statutory rights under Title IX and subjected them to increased danger.

413.    LSU's customs, practices, and/or policies were the driving force behind the retaliatory action of creating a hostile work and educational environment and silencing and/or deterring plaintiffs' reports of the sexual misconduct and hostile environment.

414.    LSU's customs, practices, and/or policies were the driving force behind the deprivation of plaintiffs' First Amendment rights.

415.    Defendants had actual knowledge of, and intentionally declined to rectify, the glaring inadequacies of the Title IX office; had actual knowledge of  and willfully participated in the failure to investigate plaintiffs' reports; had actual knowledge and willfully participated in Professor Russo's protection of and promotion of d'Espalungue; had actual knowledge of d'Espalungue's rape arrest; had actual knowledge of and willfully participated in an escalating danger to female students; and had actual knowledge of and willfully participated in their own decisions to take no action to protect the plaintiffs, unsuspecting female LSU students. Defendants' intentional actions and conscious, intentional inaction were unlawful and unreasonable and resulted in a deprivation of plaintiffs' constitutional and federally protected rights.

416.    The deprivation of plaintiffs' constitutional rights under the First Amendment was an obvious consequence of defendants' intentional actions and conscious and intentional inaction.

## COUNT IX
### Denial of Procedural Due Process (Bodily Integrity) (Does #1-5)
### 42 U.S.C. §1983 and Fourteenth Amendment
### (All Defendants)

417.    Plaintiffs adopt and incorporate by reference all previous paragraphs.

418.    All defendants are state actors and acted under color of state law at all relevant times.

419.    Section One of the Fourteenth Amendment to the United States Constitution states in relevant part, "All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

420.    Title 42 U.S.C. §1983 states in relevant part, "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…"

421.    Bodily integrity is a substantive due process right. [118]

422.    Individuals have the right to be free from bodily harm caused by the state.[119]

423.    Does #1-5 were deprived of their constitutional right to bodily integrity or personal security when LSU and the individual defendants, in their personal capacities, among other acts, intentionally failed to investigate their credible complaints of sexual misconduct by d'Espalungue—a man who was currently charged with forcible rape-- and aggressive protection of d'Espalungue by Dr. Adelaide Russo, resulting in continued and further sexual harassment and sexual assault of plaintiffs.

424.    Does #1-5 were deprived of their constitutional right to personal bodily integrity or personal security when Dr. Adelaide Russo intentionally elevated d'Espalungue's status and power in the LSU French Department, allowing him broader access to unsuspecting female students, and defendants intentionally failed to take any action whatsoever to protect female LSU students, such as Does #1-5, from the obvious danger which resulted in continued and further sexual assault and sexual harassment of plaintiffs.

425.    Does #1-5 were deprived of their constitutional right to bodily integrity or personal security when Dr. Adelaide Russo intentionally retaliated against those individuals who reported

---

[118] "Following *DeShaney*, '[t]here is a recognized substantive due process right for individuals to be free from bodily harm caused by the state, but as a general rule, there is no constitutional duty that requires state officials to protect persons from private harms." *Kovacic v. Villarreal*, 628 F.3d 209, 213 (5th Cir. 2010) (citing *DeShaney*, 489 U.S. at 189, 109 S.Ct. 998). "This general rule is not absolute: in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." *McClendon v. City of Columbia*, 305 F.3d 314, 324 (5th Cir. 2002) (citing *DeShaney*, 489 U.S. at 198, 109 S.Ct. 998)." *Lozano v. Baylor University*, 408 F.Supp.3d. 861 (W.D. TX 2019). "But the Fifth Circuit has recognized that certain minimum rights of 'bodily integrity' or 'personal security' are substantive due process rights." *Id.*

[119] "We have stated that '[t]he right to be free of state-occasioned damage to a person's bodily integrity is protected by the fourteenth amendment guarantee of due process.'" *Jefferson v. Ysleta Independent School District*, 817 F.2d 303 (5th Cir. 1982), *Doe v. Taylor Independent School District*, 15 F.3d. 443, 450 (5th Cir. 1994).

concerns and/or instances of sexual misconduct by d'Espalungue, thus creating a hostile and toxic educational and work environment, and the remaining defendants intentionally failed to take any action whatsoever to cease the unconstitutional retaliation. These aggressive acts toward plaintiffs, coupled with d'Espalungue's protection and elevation, emboldened d'Espalungue and resulted in the continued and further sexual assault and sexual harassment of plaintiffs.

426.    Defendants intentionally and/or recklessly deprived Does #1-5 of their bodily integrity by a custom, practice, and/or policy at LSU of intentionally ignoring the inadequacies of the Title IX infrastructure, choosing to under-fund, under-staff and under-resource it, intentionally failing to investigate claims of sexual misconduct and abuse on campus (in this instance, by a man who had been charged with rape of another college student), intentionally concealing acts of sexual violence from the public as evidenced by the Husch Blackwell report, intentionally failing to address retaliation against individuals such as plaintiffs for asserting their constitutionally protected rights, and intentionally failing to secure the safety of female LSU students in the face of obvious danger.[120]

427.    As demonstrated throughout this petition, LSU has a solid history of customs, practices, and/or policies which intentionally ignore the plight of sexual abuse victims like Does #1-5 and intentionally fail to fulfill its obligations to those victims and to the protection of those victim's rights under applicable federal law and the United States Constitution.

428.    The LSU Board of Supervisors and multiple individuals in position of authority, as the ultimate policymakers and leaders, had actual and/or constructive knowledge of the customs, practices, and/or policies of understaffing the Title IX office, failing to properly train employees, as well as mishandling and/or ignoring complaints of sexual misconduct, and intentionally chose not to act to rectify the situation.

429.    All defendants acted with deliberate indifference to the safety, security, and rights of plaintiffs.

430.    Dr. Russo learned of facts clearly demonstrating the inappropriate sexual behavior of d'Espalungue with plaintiffs after his rape arrests in September and October 2018, and demonstrated deliberate indifference toward plaintiffs' constitutional rights by not only

---

[120] "To state a cause of action under § 1983 for violation of the Due Process Clause, plaintiffs 'must show that they have asserted a recognized 'liberty or property' interest within the purview of the Fourteenth Amendment, and that they were intentionally or recklessly deprived of that interest, even temporarily, under color of state law.' *Griffith v. Johnston*, 899 F.2d 1427, 1435 (5th Cir.1990) (citations omitted), cert. denied, 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991)." *Doe v. Taylor Independent School District*, 15 F.3d. 443, 450  (5th Cir. 1994)

intentionally failing to take action that was obviously necessary to prevent or stop the abuse, but actively aiding d'Espalungue by intimidating plaintiffs and elevating d'Espalungue's profile and activity in the LSU French Department, which resulted in continued and further sexual abuse and harassment of Does #1-5 , depriving them of their right to bodily integrity and personal safety.

431.    Dr. Russo advised students and peers in the LSU French Department that d'Espalungue's case was not to be discussed, thus intentionally concealing the danger from the public and unsuspecting victims.

432.    The remaining defendants demonstrated deliberate indifference toward plaintiffs' constitutional rights by intentionally failing to take action that was obviously necessary to prevent or stop the sexual abuse and intimidation of plaintiffs, intentionally failing to investigate, intentionally failing to warn of danger, and intentionally failing to take any steps to stem the elevation of d'Espalungue's profile and activity in the LSU French Department, which resulted in continued and further sexual abuse and harassment of female LSU students, including Does #1-5, depriving them of their right to bodily integrity and personal safety.

433.    The actions and inactions of the defendants exacerbated a known risk of violence against female LSU students, including Does #1-5.

434.    "The deliberately indifferent state of mind can be inferred 'from the fact that the risk of harm is obvious.'" *M.D. by Stukenberg v. Abbot*, 907 F.3d at 253 (5th Cir. 2018) (citing *Hope*, 536 U.S. at 737, 122 S.Ct. 2508; *Farmer*, 511 U.S. at 842, 114 S.Ct. 1970)

435.    Defendants' customs, practices, and/or policies which included, but are not limited to, understaffing the Title IX office, intentional failing to properly train employees, intentional failing to investigate and/or intentionally ignoring sexual misconduct reports, retaliation, and intentionally failing to address retaliation were the driving force behind the violation of constitutional rights to bodily integrity and personal safety of Does #1-5 as LSU's actions and/or inaction created a heightened risk of danger to the plaintiffs.

436.    Those same customs, practices, and/or policies were the driving force behind the violation of constitutional rights to bodily integrity and personal safety Does #1-5 as LSU's actions and/or inaction emboldened and empowered d'Espalungue to continue his crimes, rendering plaintiffs more vulnerable to danger.[121]

---

[121] See Husch Blackwell report.

437.   Further, those same actions and inaction emboldened and empowered Dr. Russo to continue her hostile and retaliatory acts against plaintiffs, as well as her protection and elevation of d'Espalungue, clearing the way for him to access and abuse more female students, including Does #1-5 and violating their rights to bodily integrity under the Fourteenth Amendment.

438.   Dr. Russo's actions emboldened and empowered d'Espalungue to commit further violence against young women including Does #1-5, thus depriving plaintiffs of their constitutional protections and rights under federal law.

439.   Defendants' deliberate actions and inactions and the customs, practices, and/or policies of LSU caused Does #1-5 a deprivation of the right to bodily integrity under the Fourteenth Amendment and theirs rights and protections under applicable federal law.


## COUNT X

### Denial of Due Process (Does #2-5)
### 42 U.S.C. §1983 and Fourteenth Amendment
### (All Defendants)

440.   Plaintiffs incorporate by reference all previous paragraphs.

441.   Does #2-5 allege violations of 42 U.S.C. § 1983 against LSU and the individual defendants in their personal capacities due to deprivation of their property and liberty interests without adequate notice or a meaningful opportunity to be heard in violation of the Due Process Clause of the Fourteenth Amendment.

442.   All Defendants are state actors and at all relevant times were acting under color of law.

443.   Section One of the Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, states in pertinent part, "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

444.   42 U.S.C. §1983 states in relevant part, "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…"

445.     Under the Due Process Clause of the Fourteenth Amendment, deprivation of Plaintiffs'
liberty and property interests by state actors cannot occur without notice and a meaningful
opportunity to be heard.

446.     At all relevant times, defendants were state actors acting under color of state law.

447.     LSU and defendants created a custom, practice, and/or policy of deliberate indifference
and created a culture of silence and concealment by intentionally failing to report complaints of
sex discrimination, intentionally failing to initiate and/or conduct adequate investigations under
Title IX, and intentionally failing to ensure victims had equal access to educational and
professional opportunities, benefits and/or grievance procedures, all in direct violation of the
constitutionally and federally protected liberty and property interests of plaintiffs.

448.     Defendants intentionally failed to provide Does #2-5 with adequate notice of the actions
to be taken with regard to the sex-based discrimination had suffered, as well as meaningful
opportunities to be heard.

449.     Defendants intentionally failed to investigate the credible claims of sexual misconduct,
retaliation, and other violations of the constitutionally and federally protected rights of
Does #2 - 6.

450.     Dr. Russo's creation of a hostile work and educational environment, retaliatory acts, and
directives of silence violated the liberty and property interests of Does #1-6, including but not
limited to, accessing educational and/or professional opportunities and benefits and enjoying
equality in education.

451.     The failure of the remaining defendants to investigate the credible reports of sexual
misconduct and retaliation and defendants' deliberate indifference to the rights of plaintiffs
deprived Does #2-6 of a meaningful opportunity to be heard and deprived Plaintiffs of their
constitutionally protected liberty and property interests.

452.     Defendants' deliberate actions and inactions and the customs, practices, and/or policies of
LSU caused plaintiffs a deprivation of theirs rights under the Due Process Clause of the
Fourteenth Amendment and theirs rights and protections under applicable federal law.

**COUNT XI**
**Negligence**
**Louisiana Civil Code Article 2315 (All Plaintiffs)**
**(All Defendants)**

453.   Plaintiffs adopt and incorporate by reference all previous paragraphs.

454.   Plaintiffs allege negligence by LSU and the individual defendants in their personal and official capacities in response to reports of sexual misconduct and retaliation.

455.   As a matter of law, Defendants owed Plaintiffs a duty of reasonable care to conform to the standard of conduct of a reasonable person/institution in like circumstances.  Under the specific circumstances presented and the relationships of the parties, Defendants had obligations mandated by statute and general principles of law to ensure the safety and freedom from sex-based assault, harassment, abuse and retaliation while students at or employees of LSU and to take all measures necessary to prevent them harm.[122]

456.   As a matter of fact, Defendants breached each of these duties and obligations by failing to conform their conduct to the standard of care applicable to a reasonable person or institution by, among other things, failing to conduct prompt, fair and reasonable investigations into Plaintiffs' claims of sexual misconduct, abuse and retaliation; by creating and maintaining a "faux" Title IX system which was under-funded, under-resourced and under-staffed, despite years of recommendations by internal and external auditors and a 2017 Presidential Task Force; by failing to provide plaintiffs with appropriate interim measures and accommodations; failure to address retaliation against plaintiffs; failure to properly discipline d'Espalungue, a serial sexual predator was allowed to act with impunity for more than three years; by deliberately failing to enforce Title IX Policy; and by failure to address the hostile environment for female students and employees at LSU.

457.   Plaintiffs show that Defendants' substandard conduct was a cause in fact of their injuries, damages and losses and that there is an ease of association between the Defendants' conduct and the particular nature and type of injuries, damages and losses sustained and to be sustained by Plaintiffs.

458.   Plaintiffs' injuries, damages and losses were not only reasonably foreseeable but foreseen. The facts clearly show defendants had notice, knowledge and forewarning of the harm

---

[122] La R.C.C. art. 2315 A. provides:  Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.

Plaintiffs would suffer if the complaints about d'Espalungue were not taken seriously, and if appropriate action were not taken. Defendants made no reasonable effort to protect plaintiffs from harm.

459.    Plaintiffs further allege that Defendants' deliberate indifference, obdurate pattern of nonaction, and reckless disregard for their rights and safety were a substantial factor and legal cause of their damages.

460.    As a matter of law, Defendants are vicariously liable for all conduct of d'Espalungue and solidarily liable among each other for all damages which they could have prevented to Plaintiffs.[123]

461.    Plaintiffs' state law claims are timely filed. Until the publication of the Husch Blackwell Report on March 3, 2021, defendants had fraudulently concealed the severe breaches of duty owed to plaintiffs under Louisiana law and their deviation from Title IX responsibilities which caused their injuries.

462.    As a direct, natural, and proximate result of LSU's deliberate indifference, official policies and fraudulent concealment, plaintiffs have suffered actual damages as outlined in the "Damages" section, for which they are entitled to just compensation.

**COUNT XII**
**Negligent and Intentional Infliction of Emotional Distress**
**Louisiana Civil Code Article 2315 (All Plaintiffs)**
**(All Defendants)**

463.    Plaintiffs adopt and incorporate by reference all previous paragraphs.

464.    Plaintiffs allege negligent and intentional infliction of emotional distress by all Defendants in their response to reports of sexual misconduct and retaliation based upon the same actions and inactions set forth in detail in ¶ 460 above.

---

[123] La  R.C.C. art. 2317 provides:
> We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or the things which we have in our custody.

La. R.C.C. art. 2320 provides:
> Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed.  Teachers and artisans are answerable for the damage caused by their scholars or apprentices, while under their superintendence.

> In the above cases, responsibility only attaches, when the master, or employers, teachers and artisans, might have prevented the act which caused the damage, and have not done it.

465.    The events described would naturally and probably result in emotional distress, and Defendants' negligent and intentional actions and inactions did in fact cause severe emotional distress to plaintiffs in addition to physical and mental injuries.

466.    Defendants' conduct with respect to the severe Title IX failures were extreme and outrageous. Sexual assaults and harassment by the same serial predator were allowed to continue on an almost daily basis for a period of at least two years with the knowledge and protection of defendants.

467.    As a matter of law, this conduct and obdurate pattern of nonaction on the part of Defendants was of a tortious and synergistic nature and caused intentional infliction of emotional distress on each of them.

468.    As outlined above, plaintiffs were not subjected just to discrete acts of harassment and/or retaliation, but rather were subjected to "multiple and varied incidents of offensive conduct which had the cumulative effect" of creating a hostile educational and work environment.[124] Accordingly, since the continuous course of conduct by Defendants remains unabated the applicable prescriptive period has not commenced to run.[125]

469.    Alternatively, Plaintiffs allege that if Defendants' course of conduct has been abated, it was not until after March 3, 2021 when the Husch Blackwell Report was issued and that all of their claims are being made within one year of the date of "abatement".

470.    Plaintiffs allege that each of their claims for damages are in excess of the jurisdictional limit of this court and that they are entitled to trial by jury on all claims.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment against Defendants, Board of Supervisors of Louisiana State University and Agricultural and Mechanical College; Dr. Adelaide Russo; Dean Troy Blanchard, Jennifer Normand, Jennie Stewart and Lindsay Madatic, in their official and personal capacities and for the following relief:

A.    That judgment be entered against all Defendants for general and special compensatory damages in amounts which shall be shown to be reasonable and just by the evidence and in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interests and costs;

---

[124] *See Rabidue v. Osceola Refining Co.*, 805 F.2d 611, 620 (6th Cir. 1986).

[125] *Bustamento v. Tucker*, 607 So.2d 532, 538-540 (La. 1992)

B.  That Plaintiffs be awarded punitive damages against all individual defendants under 42
    U.S.C. §1983;

C.  That Plaintiffs be awarded all costs and attorneys' fees under 42 U. S. C. § 1988 and
    other applicable statutes.

D.  That an order of protection in favor of Plaintiffs as victims of sex offenses be issued and
    that all parties and attorneys associated with this matter be required to ensure their
    anonymity;

E.  Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs are entitled to and hereby demand trial by jury of all issues properly triable by
jury in this action.

Dated: October 4, 2021

Respectfully submitted,

**MILDRED E. METHVIN, LLC**
s/ *Mildred E. Methvin*
Mildred E. Methvin (#14619) T.A.
7414 Sardonyx St.
New Orleans, LA 70124
T: 337-501-1055
F: 888-298-0566
Email: memethvin@gmail.com

**DOMENGEAUX, WRIGHT, ROY
& EDWARDS, LLC.**
s/ *Elwood C. Stevens, Jr.*
Elwood C. Stevens, Jr. (#12,459)
Jefferson Towers, Suite 500
556 Jefferson Street
Lafayette, LA 70501
T: (337) 233-3033
F: (337) 232-8213
Email: elwoods@wrightroy.com
**ATTORNEYS FOR PLAINTIFFS
JANE DOES #1-6**

## ARTICLE 3603(A)(2) CERTIFICATE

In accordance with La. C.C.P. Art. 3603(A)(2), I hereby certify that a copy of the

foregoing has been forwarded to Emalie A. Boyce, Director of the Division of Administrative

Law and the Hon. Jeff Landry Attorney General of the State of Louisiana.


Lafayette, Louisiana this _____4th_____ day of October, 2021.


s.
Elwood C. Stevens, Jr.
La. Bar No. 12,459

### PLEASE SERVE:


Jeff Landry
Attorney General, State of Louisiana
1885 North Third Street
Baton Rouge, Louisiana 70802

Emalie A. Boyce
Director, Louisiana Division of Administrative Law
1020 Florida Street
Baton Rouge, Louisiana 70802

Board of Supervisors of Louisiana State University and Agricultural Mechanical College
3810 West Lakeshore Drive
Baton Rouge, Louisiana 70808

PLEASE WITHHOLD SERVICE ON INDIVIDUAL DEFENDANTS

UNTIL FURTHER REQUESTED

CERTIFIED TRUE AND
CORRECT COPY

NOV 05 2021

East Baton Rouge Parish
Deputy Clerk of Court